IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VINCENT P. MONA,

Plaintiff,

v.

DAVID F. McKAY

Defendant.

Civil Action No. 8:21-cv-01017-PJM

---

## AFFIDAVIT OF CALEB VULJANIC, CPA

Caleb Vuljanic, CPA, being first duly sworn, deposes and says:

1.  My name is Caleb Vuljanic. I am a Certified Public Accountant, and I am a partner with the Certified Public Accounting Firm of Dixon Hughes Goodman LLP.

2.  In my capacity as a partner with Dixon Hughes Goodman LLP, I was responsible for the financial statement audits of Mona Electric Group Inc. and Subsidiary for years ending December 31, 2019 and 2018.

3.  I am also familiar with the engagements undertaken by Dixon Hughes Goodman for Mona Electric Group Inc. and related entities for those same years.

4.  In addition to performing a financial statement audit of Mona Electric Group Inc. and Subsidiary, Dixon Hughes Goodman was engaged to prepare a corporate income tax return for Mona Electric Group Inc. for 2018 and 2019.

5.  Copies of the engagement letters under which Dixon Hughes Goodman LLP performed audits for the years ending December 31, 2019 and December 31, 2018, and for Tax return preparation for the same years, are attached as Exhibits A – D.

6.  All of the work performed for Mona Electric Group, Inc. by Dixon Hughes Goodman LLP was performed in our capacity as Certified Public Accountants.

FURTHER the affiant sayeth not.

_____

Caleb Vuljanic, CPA


EXHIBIT
A

Sworn to and subscribed before me this

the 21 day of December , 2021.

Kimbly Beckham Hatfield #7092284

Notary Public

My Commission Expires: 12/31/2024

## *CERTIFICATE OF SERVICE*

I hereby certify that the **AFFIDAVIT OF CALEB VULJANIC, CPA** was served upon the parties to this action by mailing a copy thereof by first-class, postage pre-paid mail to the following counsel of record:

Mr. Dennis Whitley, III
Shipley & Horne, PA
1101 Mercantile Lane, Suite 240
Largo, MD  20774
dwhitley@shpa.com

Mr. Adam S. Taylor
Taylor McCormack & Frame, LLC
30 Milk Street, 5th Floor
Portland, ME  04101
ataylor@tmfattorneys.com

Mr. Timothy R. Dudderar
Potter Anderson & Corroon, LLP
1313 North Market Street
Wilmington, DE  19801
tdudderar@potteranderson.com

Mr. Aaron R. Sims
Potter Anderson & Corroon, LLP
1313 North Market Street
Wilmington, DE  19801
asims@potteranderson.com

Mr. Paul J. Maloney
Carr Maloney, PC
2020 K Street, NW
Suite 850
Washington, D.C.  20006
paul.maloney@carrmaloney.com

This the 22 day of December, 2021.

Frederick K. Sharpless
fsharpless@sharplesslaw.com
N.C. State Bar No. 12551
*Attorney for Dixon Hughes Goodman LLP*

OF COUNSEL:

Sharpless McClearn Lester Duffy, PA
200 South Elm Street, Suite 400
Greensboro, North Carolina 27401
Telephone: (336) 333-63**



1410 Spring Hill Road
Suite 500
Tysons, VA 22102
D 703.970.0400
F 703.970.0401
**dhgllp.com**

November 30, 2018

Mr. Vincent Mona
Mona Electric Group, Inc.
7915 Malcolm Rd Ste 200
Clinton, Maryland 20735

Dear Mr. Mona:

We are pleased to confirm our understanding of the services we are to provide for Mona Electric Group, Inc. (the "Company") for the year ended  December 31, 2018 .

**Audit Services**

We will audit the consolidated balance sheet of Mona Electric Group, Inc. as of December 31, 2018  and the related consolidated statements of income, changes in stockholders' equity, and cash flows for the year then ended.

**Audit Objective**

The objective of our audit is the expression of an opinion about whether the Company's consolidated financial statements are fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America. Our audit will be conducted in accordance with auditing standards generally accepted in the United States of America and will include tests of the Company's accounting records and other procedures we consider necessary to enable us to express such an opinion. If our opinion is other than unmodified, we will discuss the reasons with you in advance. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, we may decline to express an opinion or to issue a report as a result of this engagement.

**Audit Procedures**

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We will plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether from errors, fraudulent financial reporting, misappropriation of assets, or violations of laws or governmental regulations that are attributable to the entity or to acts by management or employees acting on behalf of the entity.



EXHIBIT

A

Mona Electric Group, Inc.
November 30, 2018
Page 2 of 7

Because of the inherent limitations of an audit, combined with the inherent limitations of internal control, and because we will not perform a detailed examination of all transactions, there is an unavoidable risk that material misstatements may exist and not be detected by us, even though the audit is properly planned and performed in accordance with auditing standards generally accepted in the United States of America. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the consolidated financial statements. However, we will inform the appropriate level of management of any material errors, fraudulent financial reporting, or misappropriation of assets that comes to our attention. We will also inform the appropriate level of management of any violations of laws or governmental regulations that come to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audit and does not extend to any later periods for which we are not engaged as auditors.

An audit includes obtaining an understanding of the entity and its environment, including internal control, sufficient to assess the risks of material misstatement of the consolidated financial statements and to design the nature, timing, and extent of further audit procedures, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we will express no such opinion. An audit is not designed to provide assurance on internal control or to identify deficiencies in internal control. However, during the audit, we will communicate to you and those charged with governance internal control-related matters that are required to be communicated under professional standards.

Our procedures may include tests of documentary evidence supporting the transactions recorded in the accounts, tests of the physical existence of inventories, and direct confirmation of certain assets and liabilities by correspondence with selected customers, creditors, and financial institutions. We may also request written representations from the Company's attorneys as part of the engagement, and they may bill the Company for responding to this inquiry. At the conclusion of our audit, we will require certain written representations from management about the consolidated financial statements and related matters. Because of the importance of management's written or verbal representations to an effective audit, you agree to release and indemnify Dixon Hughes Goodman LLP and its personnel from any liability and costs relating to our services under this letter attributable to any knowing misrepresentations by management.

In providing our audit services we are required by law and our professional standards to maintain our independence from the Company. We take this mandate very seriously and thus guard against impermissible relationships which may impair the very independence which you and the users of our report require. As such you should not place upon us special confidence that in the performance of our audit services we will act solely in your interest. Therefore, you acknowledge and agree we are not in a fiduciary relationship with you and we have no fiduciary responsibilities to you in the performance of our services described herein.

**Management's Responsibilities**

You are responsible for designing, implementing and maintaining internal controls relevant to the preparation and fair presentation of the consolidated financial statements that are free from material misstatement, whether due to fraud or error, including monitoring ongoing activities; for the selection and application of accounting principles; and for the preparation and fair presentation in the consolidated financial statements of financial position, results of operations, and cash flows in conformity with accounting principles generally accepted in the United States of America. The responsibility for the consolidated financial statements and all representations contained therein remains with management and those charged with governance, which includes officers of the Company.

Mona Electric Group, Inc.
November 30, 2018
Page 3 of 7

You are responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. You are also responsible for providing us with access to all information of which management is aware that is relevant to the preparation and fair presentation of the consolidated financial statements such as records, documentation and other matters. You also agree to provide us with any additional information we request from management for the purpose of the audit as well as unrestricted access to any person within the Company from whom we determine it necessary to obtain audit evidence. Because this engagement qualifies as a group audit, you agree to facilitate unrestricted access to information related to components of the Company as well as persons at components (including management and those charged with governance) and component auditors.    Your responsibilities include adjusting the consolidated financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the consolidated financial statements taken as a whole.

You are responsible for the design, implementation and maintenance of programs and controls to prevent and detect fraud, and for informing us about all known or suspected fraud affecting the company involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the consolidated financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the company received in communications from employees, former employees, regulators, or others. In addition, you are responsible for identifying and ensuring that the entity complies with applicable laws and regulations.

We understand that the Company's employees will prepare all cash, accounts receivable, and other confirmations we request, and will locate any documents selected by us for testing.

You represent and warrant to us that you do not derive substantial or a material amount of revenue from the manufacture, sale or distribution of cannabis or related products ("Cannabis Products") or from activities which in any material manner support the manufacture, sale or distribution of Cannabis Products.

**Supplementary Information**

Our audit is for the purpose of forming an opinion on the consolidated financial statements taken as a whole. We understand that the following supplementary information will accompany the basic consolidated financial statements: Schedule of Earnings from Contracts, Schedule of Construction and Service Contracts in Progress, Schedule of Construction and Service Contracts Completed, and Schedule of General and Administrative Expenses. Such information is presented for the purpose of additional analysis of the consolidated financial statements and is not a required part of the basic consolidated financial statements. The Company's management is responsible for the fair presentation of the supplementary information. We will subject the supplementary information to the auditing procedures applied in the audit of the consolidated financial statements and certain additional procedures, including comparing and reconciling such information directly to the accounting and other records used to prepare the consolidated financial statements or to the consolidated financial statements themselves in accordance with auditing standards generally accepted in the United States of America.

Our responsibility is to report whether such information is fairly stated in all material respects in relation to the basic consolidated financial statements taken as a whole. You agree to include our report on supplementary information in any document that contains and indicates that we have reported on the supplementary information. You also agree to include the audited consolidated financial statements with any presentation of the supplementary information that includes our report thereon.

**Management Responsibility for Nonattest Services**

You agree to assume all management responsibilities and to oversee the non-attest services we will provide by designating an individual possessing suitable skill, knowledge and/or experience. You are responsible for evaluating the adequacy and results of the services performed and accepting responsibility for the results of such services. You are responsible for designing, implementing, and maintaining internal controls.

The non-attest services we will provide are covered in the following paragraphs.

Mona Electric Group, Inc.
November 30, 2018
Page 4 of 7

## Other Nonattest Services

We will provide the following additional non-attest services:

- We may advise management about appropriate accounting principles and their application and will assist in preparation of the Company's consolidated financial statements. The responsibility for the consolidated financial statements and all representations contained therein remains with management, which includes officers and directors of the Company;

- Based on information you provide, we will assist you with the calculation of the provision for current income taxes including the deferred income tax schedules (if applicable);

You are responsible for evaluating the adequacy and results of the above non-attest services performed and accepting responsibility for the results of such services. This includes your review and approval of all adjustments we may propose to the accounting records of the Company or its consolidated financial statements as a result of these services.

## Use of Financial Statements

If the Company's financials are to be included in a client-prepared document which includes other information, the Company should notify us of the nature of the document and allow us to read such document prior to submitting the document to others. Examples of other documents would include, but not be limited to, reports to shareholders which provide commentary on the financial position or results of operations, private placement offerings or other offers to sell securities.

Should the Company wish to include our audit report on the consolidated financial statements described above in a document related to an offering of securities exempt from registration with the Securities and Exchange Commission ("SEC"), but does not intend to engage us to perform procedures in connection with the proposed offering (beyond reading the document as required in the preceding paragraph), the Company agrees that the following disclosure will be prominently displayed in the official statement or other document for the proposed offering:

*Dixon Hughes Goodman LLP, have not been engaged to perform and have not performed, since the date of their report included herein, any procedures on the financial statements addressed in that report. Dixon Hughes Goodman LLP, also has not performed any procedures relating to this Official Statement.*

Should the Company wish to include or incorporate by reference our report on these consolidated financial statements into a future filing under the Securities Act of 1933, or an exempt offering, and requests or is required to obtain our acknowledgement or consent to including our report in such filing or other offering document, prior to our acknowledging or consenting to include or incorporate by reference our report thereon, we will be required to perform procedures as indicated by our professional standards, including, but not limited to, reading other information incorporated by reference in the registration statement or other offering document, and performing subsequent event procedures. Our reading of the other information included or incorporated by reference in the offering document will consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the consolidated financial statements. However, we will not perform procedures to corroborate such other information (including forward-looking statements). The specific terms of our future services with respect to future filings or other offering documents will be negotiated and agreed to at the time the services are to be performed.

In connection with providing our professional services, we may engage the assistance of outside service providers for non-substantive services. We may share confidential information about you with these service providers, but remain committed to maintaining the confidentiality and security of your information. Accordingly, we maintain internal policies, procedures, and safeguards to protect the confidentiality of your information. In addition, we will secure confidentiality agreements with all service providers to maintain the confidentiality of your information and we will take reasonable precautions to determine that they have appropriate procedures in place to prevent the unauthorized release of your confidential information to others. In the event that we are unable to secure an appropriate confidentiality agreement, you will be asked to provide your consent prior to the sharing of your confidential information with the third-party service provider. Furthermore, we are responsible for the adequate

Mona Electric Group, Inc.
November 30, 2018
Page 5 of 7

oversight of all services provided by the third-party service provider and for ensuring that all services are performed with competence and due professional care.

The audit documentation for this engagement is the property of Dixon Hughes Goodman LLP and constitutes confidential information. However, we may be requested to make certain audit documentation available to regulators pursuant to authority given to it by law or regulation. If requested, access to such audit documentation will be provided under supervision of our personnel. Furthermore, upon request, we may provide copies of selected audit documentation to regulators. The regulators may intend, or decide, to distribute the copies or information contained therein to others, including other government agencies.

This engagement is limited to the services outlined above.

Caleb Vuljanic, CPA is the engagement partner and is responsible for supervising the engagement and signing the report or authorizing another individual to sign it. We plan to begin our interim audit work in December 2018, with final audit work in February 2019.

**Engagement Fees**

Our fees for these services will be based upon the time, skill and resources, including our proprietary information required to complete the services, plus all out-of-pocket expenses. However, you acknowledge the complexity of the issues involved and unforeseen circumstances may result in additional charges. In such event we will discuss with you the basis of any such charge.

We estimate that our fees for these services will be $46,500. We will also invoice for travel and other out-of-pocket costs such as report production, typing, postage, etc.  The fee and expense estimate is a guide only and should not be regarded as a firm quotation. The fee estimate is based on anticipated cooperation from the Company's personnel and the assumption that unexpected circumstances will not be encountered during the engagement. If significant additional time is necessary or additional services are requested, we will discuss a revised fee arrangement with you.

Our invoices for these fees will be rendered each month as work progresses and are payable on presentation in U.S. Dollars. A 1½ percent per month interest charge will be added to all accounts not paid within thirty (30) days. If there is a significant change in your organizational structure or size due to acquisitions or other events, we reserve the right to revise our fees. We shall have the right to halt or terminate entirely our services until payment is received on past due invoices.

President Trump signed sweeping tax reform legislation into law on December 22, 2017.  While many of the new provisions do not go into effect until 2018, accounting principles generally accepted in the United States of America require the effects of changes in tax laws and enacted rates to be recognized in the financial statements as of the date of enactment. As a result, additional work may be necessary related to the tax provision.  We are still working through the implications of the legislation for your particular situation and, at this time, have not yet quantified the additional procedures that may be required.  Unless otherwise stated, this additional work is not contemplated in any estimated fee range or fixed fee quote provided within this letter. We will discuss with you any significant additional procedures and fees that may be required prior to commencing on those additional services.

Should you require additional services incidental to those specified herein which are not the subject of a separate engagement letter, upon your request for the performance of those services we will confirm to you in writing or by electronic mail the requested services we will provide. Such services, including our fees, shall be rendered subject to and in accordance with the provisions of this letter.

In providing our services we may direct you to provide your information to us through a separate web based client portal in an effort to provide greater security with respect to the information. In the event we request you provide your information to us through such a client portal, to the extent you fail to do so or in using the client portal you fail to monitor and restrict access only to your authorized personnel (any such failure being referred to herein as a "Portal Failure") we disclaim, and you release us from, any and all liability for loss and damage, including direct, indirect, consequential, incidental, and special damages such as loss of revenue or anticipated profits, arising from any interception, unintentional disclosure or communication or unauthorized use of such information incident to a

Mona Electric Group, Inc.
November 30, 2018
Page 6 of 7

Portal Failure. In addition, you agree not to provide access to the client portal for use by any third-party with whom you are affiliated by contract or otherwise without our express prior written consent, and you shall indemnify and hold us harmless from and against any and all claims by any such third-party for all damages whatsoever, including direct or indirect damages, consequential, exemplary, incidental, special or punitive damages including lost profits or lost data, arising from such third party's use of materials on, accessed through, or downloaded from the client portal even if we are aware or have been advised of the use of or the access to, the client portal by such third party in contravention of the restrictions set forth herein.

Many of our clients choose to communicate with us by email, and we may use email in connection with this engagement unless you direct us otherwise. We will use reasonable precautions to protect your confidential information, but we have no obligation to employ any measures that you do not regularly employ in protecting your confidential information. As emails can be intercepted and read, disclosed, or otherwise used or communicated by an unintended third party, or may not be delivered to each of the parties to whom they are directed, we cannot guarantee or warrant that email from us will be properly delivered and read only by the addressee. Therefore, we specifically disclaim any liability or responsibility whatsoever for interception or unintentional disclosure or communication of email transmissions, or for the unauthorized use or failed delivery of emails transmitted by us in connection with the performance of this engagement, or the disclosure or communication of confidential or proprietary information arising therefrom (hereinafter collectively referred to as "Email Interruption"). You agree that we shall have no liability for any loss or damage to any person or entity resulting from or related to any Email Interruption, including any consequential, incidental, direct, indirect, or special damages, such as loss of revenues or anticipated profits, and you hereby forever release us from any such liability and shall indemnify us from any claim related thereto.

This agreement and any claim arising out of the services provided shall be governed by the laws of the state of North Carolina, exclusive of its conflict of laws rules. The parties agree that any action between them related to or arising out of this engagement shall be brought only in the state or federal courts of North Carolina.

In the event DHG is required to respond to a subpoena, court order, government regulatory inquiry or other legal process relating to you or your management for the production of documents and/or testimony relative to information we obtained or prepared incident to this or any other engagement, you shall compensate DHG for all time we expend in connection with such response at normal and customary hourly rates, and to reimburse us for all out of pocket expenses incurred in regard to such response.

Whenever possible, each provision of this agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision hereof shall be ineffective or invalid, such ineffectiveness or invalidity shall be only to the extent of such prohibition or invalidity, without invalidating the remainder of the provision or the remaining provisions of this agreement, which shall otherwise remain in full force and effect. The agreements of Mona Electric Group, Inc. and Dixon Hughes Goodman LLP contained in this engagement letter shall survive the completion or termination of this engagement.

Please indicate your acceptance of the above understanding by signing this letter in the space below and returning it to our office. If your needs change during the year, the nature of our services can be adjusted appropriately. Likewise, if you have special projects with which we can assist, please let us know.

We want to express our appreciation for this opportunity to work with Mona Electric Group, Inc..

Sincerely,

Mona Electric Group, Inc.
November 30, 2018
Page 7 of 7

*Dixon Hughes Goodman LLP*

**Dixon Hughes Goodman LLP**

**Accepted and Agreed:**

*Mona Electric Group, Inc.*

Mr. Vincent P. Mona

Date    12|11|18



1410 Spring Hill Road
Suite 500
Tysons, Virginia 22102
D 703.970.0400
F 703.970.0401
dhg.com

November 18, 2019

Mr. Vincent Mona
Mona Electric Group, Inc.
7915 Malcolm Rd Ste 200
Clinton, Maryland 20735

Dear Mr. Mona:

We are pleased to confirm our understanding of the services we are to provide for Mona Electric Group, Inc. and Subsidiary, (the "Company") for the year ending December 31, 2019.

**Audit Services**

We will audit the consolidated balance sheet of Mona Electric Group, Inc. and Subsidiary as of December 31, 2019, and the related statements of income, changes in stockholder's equity, and cash flows for the year then ending.

**Audit Objective**

The objective of our audit is the expression of an opinion about whether the Company's consolidated financial statements are fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America. Our audit will be conducted in accordance with auditing standards generally accepted in the United States of America and will include tests of the Company's accounting records and other procedures we consider necessary to enable us to express such an opinion. If our opinion is other than unmodified, we will discuss the reasons with you in advance. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, we may decline to express an opinion or to issue a report as a result of this engagement.

**Audit Procedures**

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We will plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether from errors, fraudulent financial reporting, misappropriation of assets, or violations of laws or governmental regulations that are attributable to the Company or to acts by management or employees acting on behalf of the Company.

Because of the inherent limitations of an audit, combined with the inherent limitations of internal control, and because we will not perform a detailed examination of all transactions, there is an unavoidable risk that material misstatements may exist and not be detected by us, even though the audit is properly planned and performed in accordance with auditing standards generally accepted in the United States of America. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the consolidated financial statements. However, we will inform the appropriate level of management of any material errors, fraudulent financial reporting, or misappropriation of assets that come to our



PRAXITY

EXHIBIT

B

Mona Electric Group, Inc.
November 18, 2019
Page 2 of 7

attention. We will also inform the appropriate level of management of any violations of laws or governmental regulations that come to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audit and does not extend to any later periods for which we are not engaged as auditors.

An audit includes obtaining an understanding of the entity and its environment, including internal control, sufficient to assess the risks of material misstatement of the consolidated financial statements and to design the nature, timing, and extent of further audit procedures, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we will express no such opinion. An audit is not designed to provide assurance on internal control or to identify deficiencies in internal control. However, during the audit, we will communicate to you and those charged with governance internal control-related matters that are required to be communicated under professional standards.

Our procedures may include tests of documentary evidence supporting the transactions recorded in the accounts, tests of the physical existence of inventories, and direct confirmation of certain assets and liabilities by correspondence with selected customers, creditors, and financial institutions. We may also request written representations from the Company's attorneys as part of the engagement, and they may bill the Company for responding to this inquiry. At the conclusion of our audit, we will require certain written representations from management about the consolidated financial statements and related matters. Because of the importance of management's written or verbal representations to an effective audit, you agree to release and indemnify Dixon Hughes Goodman LLP and its personnel from any liability and costs relating to our services under this letter attributable to any knowing misrepresentations by management.

In providing our audit services we are required by law and our professional standards to maintain our independence from the Company. We take this mandate very seriously and thus guard against impermissible relationships which may impair the very independence which you and the users of our report require. As such you should not place upon us special confidence that in the performance of our audit services we will act solely in your interest. Therefore, you acknowledge and agree we are not in a fiduciary relationship with you and we have no fiduciary responsibilities to you in the performance of our services described herein.

**Management's Responsibilities**

You are responsible for designing, implementing and maintaining internal controls relevant to the preparation and fair presentation of the consolidated financial statements that are free from material misstatement, whether due to fraud or error, including monitoring ongoing activities; for the selection and application of accounting principles; and for the preparation and fair presentation in the consolidated financial statements of financial position, results of operations, and cash flows in conformity with accounting principles generally accepted in the United States of America. The responsibility for the consolidated financial statements and all representations contained therein remains with management and those charged with governance, which includes officers and directors of the Company.

You are responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. You are also responsible for providing us with access to all information of which management is aware that is relevant to the preparation and fair presentation of the consolidated financial statements such as records, documentation and other matters. You agree to provide us with any additional information we request from management for the purpose of the audit as well as unrestricted access to any person within the Company from whom we determine it necessary to obtain audit evidence. Because this engagement qualifies as a group audit, you agree to facilitate unrestricted access to information related to components of the Company as well as persons at components (including management and those charged with governance) and component auditors. Your responsibilities include adjusting the consolidated financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the consolidated financial statements taken as a whole.

Mona Electric Group, Inc.
November 18, 2019
Page 3 of 7

You are responsible for the design, implementation and maintenance of programs and controls to prevent and detect fraud, and for informing us about all known or suspected fraud affecting the Company involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the consolidated financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the company received in communications from employees, former employees, regulators, or others. You are also responsible for identifying and ensuring that the entity complies with applicable laws and regulations.

We understand that the Company's employees will prepare all cash, accounts receivable, and other confirmations we request and will locate any documents selected by us for testing.

**Supplementary Information**

Our audit is for the purpose of forming an opinion on the consolidated financial statements taken as a whole. We understand that the following supplementary information will accompany the basic consolidated financial statements: identify supplementary or consolidating financial information. Such information is presented for the purpose of additional analysis of the consolidated financial statements and is not a required part of the basic consolidated financial statements. The Company's management is responsible for the fair presentation of the supplementary information. We will subject the supplementary information to the auditing procedures applied in the audit of the consolidated financial statements and certain additional procedures, including comparing and reconciling such information directly to the accounting and other records used to prepare the consolidated financial statements or to the consolidated financial statements themselves in accordance with auditing standards generally accepted in the United States of America.

Our responsibility is to report whether such information is fairly stated in all material respects in relation to the basic consolidated financial statements taken as a whole. You agree to include our report on supplementary information in any document that contains and indicates that we have reported on the supplementary information. You agree to include the audited consolidated financial statements with any presentation of the supplementary information that includes our report thereon.

**Management Responsibility for Non-attest Services**

You agree to assume all management responsibilities and to oversee the non-attest services we will provide by designating an individual possessing suitable skill, knowledge and experience. You are responsible for evaluating the adequacy and results of the services performed and accepting responsibility for the results of such services. You are responsible for designing, implementing, and maintaining internal controls.

The non-attest services we will provide are covered in the following paragraphs.

**Other Non-attest Services**

- We may advise management about appropriate accounting principles and their application and will assist in preparation of the Company's consolidated financial statements. The responsibility for the consolidated financial statements and all representations contained therein remains with management, which includes officers and directors of the Company;

- We will calculate the provision for current income taxes, maintain deferred income tax schedules (if applicable), including preparation of any related adjusting or correcting journal entries for deferred tax assets and liabilities, and any required valuation allowances; and

- Based on the information you provide, we may advise management about the appropriate accounting principles and their application for revenue pursuant to the Accounting Standards Codification (ASC) Topic 606, Revenue from Contracts with Customers. The responsibility for the adoption of ASC Topic 606 and all representations contained therein remains with management, which includes officers and directors of the Company;

Mona Electric Group, Inc.
November 18, 2019
Page 4 of 7

You are responsible for evaluating the adequacy and results of the above non-attest services performed and accepting responsibility for the results of such services. This includes your review and approval of all adjustments we may propose to the accounting records of the Company or its consolidated financial statements as a result of these services.

With respect to any non-attest services provided, you are responsible for downloading and storing such deliverables in information systems controlled by your company or organization within ninety days of the completion date of the non-attest service. To the extent a web-based portal is utilized for the transmission of non-attest service deliverables, you agree that any web-based portal controlled by Dixon Hughes Goodman LLP will not be relied on as a data repository and acknowledge that any non-attest service deliverables will be removed from the web-based portal ninety days after the non-attest service completion date.

**Use of Consolidated Financial Statements**

If the Company's financials are to be included in a client-prepared document which includes other information, the Company should notify us of the nature of the document and allow us to read such document prior to submitting the document to others. Examples of other documents would include, but not be limited to, reports to shareholders which provide commentary on the financial position or results of operations, private placement offerings or other offers to sell securities.

Should the Company wish to include our audit report on the consolidated financial statements described above in a document related to an offering of securities exempt from registration with the Securities and Exchange Commission ("SEC"), but does not intend to engage us to perform procedures in connection with the proposed offering (beyond reading the document as required in the preceding paragraph), the Company agrees that the following disclosure will be prominently displayed in the official statement or other document for the proposed offering:

> Dixon Hughes Goodman LLP, have not been engaged to perform and have not performed, since the date of their report included herein, any procedures on the consolidated financial statements addressed in that report. Dixon Hughes Goodman LLP, also has not performed any procedures relating to this Official Statement.

Should the Company wish to include or incorporate by reference our report on these consolidated financial statements into a future filing under the Securities Act of 1933, or an exempt offering, and requests or is required to obtain our acknowledgement or consent to including our report in such filing or other offering document, prior to our acknowledging or consenting to include or incorporate by reference our report thereon, we will be required to perform procedures as indicated by our professional standards, including, but not limited to, reading other information incorporated by reference in the registration statement or other offering document, and performing subsequent event procedures. Our reading of the other information included or incorporated by reference in the offering document will consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the consolidated financial statements. However, we will not perform procedures to corroborate such other information (including forward-looking statements). The specific terms of our future services with respect to future filings or other offering documents will be negotiated and agreed to at the time the services are to be performed.

In connection with providing our professional services described herein, Dixon Hughes Goodman LLP may utilize the services of third party service providers to complete these services. In addition, Dixon Hughes Goodman LLP may use third party providers to provide, at Dixon Hughes Goodman LLP's discretion, administrative, clerical and data analysis services to Dixon Hughes Goodman LLP in connection with our professional services. In the performance of these services for Dixon Hughes Goodman LLP, we may share confidential information with the third party service providers, but remain committed to maintaining the confidentiality and security of your information. Accordingly, we maintain internal policies, procedures, and safeguards to protect the confidentiality of your information. Dixon Hughes Goodman LLP represents to Mona Electric Group, Inc. and Subsidiary that each such third party service provider has agreed to conditions of confidentiality with respect to Mona Electric Group, Inc. and Subsidiary's information to the same or similar extent as Dixon Hughes Goodman LLP has agreed. Furthermore, we are responsible for the adequate oversight of services provided by these third party service providers.

Mona Electric Group, Inc.
November 18, 2019
Page 5 of 7

The audit documentation for this engagement is the property of Dixon Hughes Goodman LLP and constitutes confidential information. However, we may be requested to make certain audit documentation available to regulators pursuant to authority given to it by law or regulation. If requested, access to such audit documentation will be provided under supervision of our personnel. Furthermore, upon request, we may provide copies of selected audit documentation to regulators. The regulators may intend, or decide, to distribute the copies or information contained therein to others, including other government agencies.

This engagement is limited to the services outlined above.

Caleb Vuljanic is the engagement partner and is responsible for supervising the engagement and signing the report or authorizing another individual to sign it. We plan to begin our audit work in December 2019.

**Engagement Fees**

Our fees for these services will be based upon the time, skill and resources, including our proprietary information required to complete the services, plus all out-of-pocket expenses. However, you acknowledge the complexity of the issues involved and unforeseen circumstances may result in additional charges. In such event we will discuss with you the basis of any such charge.

As we discussed in prior communications, the Company is required to adopt Accounting Standards Codification Topic 606, Revenue from Contracts with Customers, in the period under audit. The new standard is principles-based and focuses on the substance of the contract; thus, significant judgment is needed to determine the appropriate accounting treatment. Depending on the complexity and variation of an entity's contracts, substantial effort and resources are required to identify, scope, analyze, and document all in-scope revenue streams. These efforts will be necessary regardless of whether there is a material change in the recognition of revenue. As such, certain additional procedures will be required to audit the adoption of this accounting standard. Our fees for the audit procedures over the implementation of Topic 606 wil be based upon the time, skill and resources, including our proprietary information required to complete the service. This estimate is included in our total fees noted below. If significant additional time is necessary or additional services are requested (such as providing advice about the accounting standard and its application), we will discuss a revised fee arrangement with you.

We estimate that our fees for these services will range from $58,000 to $62,000, inclusive of Topic 606 procedures described in the previous paragraph. We will also invoice for travel and other out-of-pocket costs such as report production, typing, postage, etc. The fee and expense estimate is a guide only and should not be regarded as a firm quotation. The fee estimate is based on anticipated cooperation from the Company's personnel and the assumption that unexpected circumstances will not be encountered during the engagement. If significant additional time is necessary or additional services are requested, we will discuss a revised fee arrangement with you.

Our fees for these services will be billed pursuant to the following schedule, and are based on anticipated cooperation from the Company's personnel and the assumption that unexpected circumstances will not be encountered. If significant additional time is necessary, we will discuss a revised fee arrangement with you. We will also invoice for travel and other out-of-pocket costs such as report production, typing, postage, etc.

The aforementioned fees will be billed pursuant to the following schedule:

| | | |
|---|---|---|
| Week of December 16, 2019 (interim procedures) | $ | 20,000 |
| Week of February 10, 2020 (fieldwork procedures begin) | | 20,000 |
| Upon issuance of final report | | 18,000 |
| Total | $ | 58,000 |

Our invoices for these fees will be rendered each month as work progresses and are payable on presentation in U.S. Dollars. A 1½ percent per month interest charge will be added to all accounts not paid within thirty (30) days. If there is a significant change in your organizational structure or size due to acquisitions or other events, we reserve the right to revise our fees. We shall have the right to halt or terminate entirely our services until payment is received on past due invoices.

Mona Electric Group, Inc.
November 18, 2019
Page 6 of 7

Should you require additional services incidental to those specified herein which are not the subject of a separate engagement letter, upon your request for the performance of those services we will confirm to you in writing or by electronic mail the requested services we will provide. Such services, including our fees, shall be rendered subject to and in accordance with the provisions of this letter.

In providing our services we may direct you to provide your information to us through a separate web based client portal in an effort to provide greater security with respect to the information. In the event we request you provide your information to us through such a client portal, to the extent you fail to do so or in using the client portal you fail to monitor and restrict access only to your authorized personnel (any such failure being referred to herein as a "Portal Failure") we disclaim, and you release us from, any and all liability for loss and damage, including direct, indirect, consequential, incidental, and special damages such as loss of revenue or anticipated profits, arising from any interception, unintentional disclosure or communication or unauthorized use of such information incident to a Portal Failure. In addition, you agree not to provide access to the client portal for use by any third-party with whom you are affiliated by contract or otherwise without our express prior written consent, and you shall indemnify and hold us harmless from and against any and all claims by any such third-party for all damages whatsoever, including direct or indirect damages, consequential, exemplary, incidental, special or punitive damages including lost profits or lost data, arising from such third party's use of materials on, accessed through, or downloaded from the client portal even if we are aware or have been advised of the use of or the access to, the client portal by such third party in contravention of the restrictions set forth herein.

Many of our clients choose to communicate with us by email, and we may use email in connection with this engagement unless you direct us otherwise. We will use reasonable precautions to protect your confidential information, but we have no obligation to employ any measures that you do not regularly employ in protecting your confidential information. As emails can be intercepted and read, disclosed, or otherwise used or communicated by an unintended third party, or may not be delivered to each of the parties to whom they are directed, we cannot guarantee or warrant that email from us will be properly delivered and read only by the addressee. Therefore, we specifically disclaim any liability or responsibility whatsoever for interception or unintentional disclosure or communication of email transmissions, or for the unauthorized use or failed delivery of emails transmitted by us in connection with the performance of this engagement, or the disclosure or communication of confidential or proprietary information arising therefrom (hereinafter collectively referred to as "Email Interruption"). You agree that we shall have no liability for any loss or damage to any person or entity resulting from or related to any Email Interruption, including any consequential, incidental, direct, indirect, or special damages, such as loss of revenues or anticipated profits, and you hereby forever release us from any such liability and shall indemnify us from any claim related thereto.

You represent and warrant to us that Company does not derive substantial or a material amount of revenue from the manufacture, sale or distribution of cannabis or related products ("Cannabis Products") or from activities which in any material manner support the manufacture, sale or distribution of Cannabis Products.

This agreement and any claim arising out of the services provided shall be governed by the laws of the state of North Carolina, exclusive of its conflict of laws rules. The parties agree that any action between them related to or arising out of this engagement shall be brought only in the state or federal courts of North Carolina.

In the event Dixon Hughes Goodman LLP is required to respond to a subpoena, court order, government regulatory inquiry or other legal process relating to you or your management for the production of documents and/or testimony relative to information we obtained or prepared incident to this or any other engagement, you shall compensate Dixon Hughes Goodman LLP for all time we expend in connection with such response at normal and customary hourly rates, and to reimburse us for all out of pocket expenses incurred in regard to such response.

Whenever possible, each provision of this agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision hereof shall be ineffective or invalid, such ineffectiveness or invalidity shall be only to the extent of such prohibition or invalidity, without invalidating the remainder of the provision or the remaining provisions of this agreement, which shall otherwise remain in full force and effect. The agreements of Mona Electric Group, Inc. and Subsidiary and Dixon Hughes Goodman LLP contained in this

Mona Electric Group, Inc.
November 18, 2019
Page 7 of 7

engagement letter shall survive the completion or termination of this engagement.

Please indicate your acceptance of the above understanding by signing this letter in the space below and returning it to our office. A copy is enclosed for your records. If your needs change during the year, the nature of our services can be adjusted appropriately. Likewise, if you have special projects with which we can assist, please let us know.

We want to express our appreciation for this opportunity to work with Mona Electric Group, Inc. and Subsidiary.

Sincerely,

*Dixon Hughes Goodman LLP*

**DIXON HUGHES GOODMAN LLP**

**Accepted and Agreed:**

**Mona Electric Group, Inc.**

Mr. Vincent Mona

Date _____ 11/27/2019 _____



9801 Washingtonian Blvd
Suite 200
Gaithersburg, MD 20878
P 240.403.3700
F 240.403.3701
dhg.com

January 14, 2019

## Private and Confidential

Mr. Vincent P. Mona
Board of Directors
Mona Electric Group, Inc.
7915 Malcolm Road
Suite 200
Clinton, MD 20735

Dear Mr. Mona:

This letter is to confirm and specify the terms of our engagement with Mona Electric Group, Inc. (the "Company"), and to clarify the nature and extent of the services we will provide. By signing this engagement letter, we have assumed that you are the person responsible for the tax matters of the entity from whom we shall receive all inquiries and requests. If this is not a correct assumption, please furnish us with the name of the individual with whom this work should be coordinated.

You agree to assume all management responsibilities and to oversee the income tax preparation and any other nonattest services we will provide by designating an individual possessing suitable skill, knowledge and/or experience. You are responsible for evaluating the adequacy and results of the services performed and accepting responsibility for the results of such services. You are responsible for designing, implementing, and maintaining internal controls.

You represent and warrant to us that you do not derive substantial or a material amount of revenue from the manufacture, sale or distribution of cannabis or related products ("Cannabis Products") or from activities which in any material manner support the manufacture, sale or distribution of Cannabis Products.

The nonattest services we will provide are covered in the following paragraphs.

### Tax Return Services

We will prepare the federal, District of Columbia, Maryland and Virginia corporate income tax returns for the Company for the year ended December 31, 2018. Your returns may be electronically filed with the IRS and certain states. We will provide you with a copy of your final returns for review prior to such electronic transmission. The IRS requires that you sign an e-file authorization form indicating that you have reviewed the return, it is correct to the best of your knowledge, and you authorize us to submit it electronically. We cannot transmit any return until we have the appropriate signed authorizations.

The Dixon Hughes Goodman LLP Tax Services Standard Terms and Conditions shall apply and are hereby incorporated as part of this agreement. A copy of the Tax Services Standard Terms and Conditions are included as an attachment to this engagement letter.

You should retain all the documents and other data that form the basis of the return. These may be necessary to prove the accuracy and completeness of the return to a taxing authority. We will not audit or otherwise verify the data you submit, although it may be necessary to ask you for clarification of some of the information. You have the responsibility to understand the nature of any reconciling items between the financial statements and the tax returns. Management has the final responsibility for the income tax returns and, therefore, should review them carefully before signing and filing them



EXHIBIT

C

Mona Electric Group, Inc.
January 14, 2019
Page 2

By your signature below, you are confirming to us that, unless we are otherwise advised, any travel, entertainment, gifts, and related expenses; any charitable contributions; and any use of "listed property" (autos, etc.) are supported by the necessary records required under the Internal Revenue Code. If you have any questions as to the type of records required, please ask us for advice in that regard.

We will use our professional judgment in resolving questions where the tax law is unclear, or where there may be conflicts between the taxing authorities' interpretations of the law and other supportable positions. Unless otherwise instructed by management, we will resolve such questions in the Company's favor whenever possible. We will advise you with regard to tax positions taken in preparation of the tax returns, but you must make all decisions with regard to those matters. Notwithstanding anything to the contrary, we will not be required to take any position with respect to any tax return which would subject us to a tax return preparer penalty; we will advise you of the same, and we reserve the right to withdraw from this engagement if you wish to continue to take such tax position. In the event of our withdrawal, the Company shall continue to be responsible and obligated to pay our fees through the date of withdrawal.

The law provides various penalties that may be imposed when taxpayers understate their tax liability. If management would like information on the amount or circumstances of these penalties, please contact us.

The U.S. Department of the Treasury requires information reporting with respect to U.S. persons or entities having a financial interest in, or signature or other authority over, bank accounts, securities, or other financial accounts having a value exceeding $10,000 in a foreign country; this applies to taxpayers that have direct or indirect control over a foreign or domestic entity with foreign financial accounts, even if the taxpayer does not have foreign accounts. The Internal Revenue Service also requires information reporting with respect to (i) certain foreign owners of U.S. entities and transactions with those entities and related parties; (ii) certain ownership by U.S. persons or entities of, beneficial interests of U.S. persons or entities in, and certain transactions with, foreign entities such as foreign corporations, foreign partnerships, foreign limited liability companies, foreign trusts, and foreign disregarded entities; (iii) certain gifts or inheritances received from foreign persons or entities; and (iv) direct or indirect operations in a country on the Secretary of the Treasury's list of international boycott jurisdictions. Taxpayers are also required to report certain interests in "specified foreign financial assets" with their income tax return. This reporting requirement is much broader than, and is in addition to, filings related to foreign financial interests and other returns related to international activities. Failure to disclose the required information to the U.S. Department of the Treasury and/or the Internal Revenue Service may result in substantial civil and/or criminal penalties. Furthermore, failure to file could result in extending the statute of limitations on your income tax return until three years after an omission is remedied. By your signature below, you accept responsibility for informing us of all such situations and reportable assets, and timely providing us with the information to prepare the required form(s).

The Company's returns may be selected for review by the taxing authorities. Any proposed adjustments by the examining agent are subject to certain rights of appeal. In the event of such government tax examination, we will be available, upon request, to represent the Company and will render additional invoices for the time and expenses incurred.

Our engagement for the above-referenced tax work does not include any procedures designed to detect material errors, irregularities, or illegal acts, including fraud or defalcations, should any exist.

Our engagement for the above-referenced tax work does not include the responsibility to amend or correct tax returns as a result of retroactive tax law changes that may occur subsequent to this engagement. In the event of such retroactive tax law change, upon request we will be available to prepare such amended or corrected returns, and will render additional invoices for the time and expenses incurred.

You are giving our firm permission to mark the box on your return that grants limited authorization to the person who signed your return to discuss with the IRS questions that may arise during the processing of your return.

Mona Electric Group, Inc.
January 14, 2019
Page 3

## Other Nonattest Services
We will provide the following additional nonattest services:

### *Supporting Calculations Assistance*

- Based on information you provide and as part of our tax services, we will maintain detailed tax depreciation schedules, including assignment of asset lives, salvage values, Section 179 treatment, and depreciation methods, calculate tax depreciation (cost recovery) expense, and prepare any required tax adjustments;

- Rollforward of basis schedules for shareholders/partners; and

- Based on information you provide, we will prepare property tax listings for Maryland.

Additionally, we may provide routine tax consulting assistance as may be requested from time to time by the Company. Such services may include tax research, analysis, consultations, assistance with tax examinations, and other routine tax consulting services. Fees for these services will be billed at the Standard Hourly Rates (SHR) for the personnel performing the services. Services for significant tax projects may be described in a separate engagement letter.

You are responsible for evaluating the adequacy and results of the above nonattest services performed and accepting responsibility for the results of such services. This includes your review and approval of all adjustments we may propose to the accounting records of the Company or its financial statements as a result of these services.

Our engagement is limited to the tax work specifically set forth in this letter and does not encompass any other tax services including, without limitation, any sales and use tax services.

We are able to provide additional tax services as needed and requested by you for an additional fee. A partial listing of additional tax services is attached to this letter. Unless specifically listed above, these services are not included as part of this engagement. If you are interested in any of the listed services, please let us know as soon as possible so we can discuss specifics with you. If you and we agree to any of these additional services, we will either document that agreement in an addendum to this letter or in a separate engagement letter, depending on the nature of the additional services. Such services, including our fees, shall be rendered subject to and in accordance with the provisions of this letter.

## Engagement Fees
Our fees for these services will be based upon the time, skill and resources, including our proprietary information, required to complete the services plus all out-of-pocket expenses. However, you acknowledge the complexity of the issues involved and that unforeseen circumstances may result in additional charges. In such event, we will discuss with you the basis of any such charge.

President Trump signed sweeping tax reform legislation into law on December 22, 2017. The majority of new provisions under this law are first effective for 2018 tax years. As a result the new law will most likely have a significant impact on the preparation of your 2018 tax return. At this time Treasury is continuing to issue guidance on implementation of the law. We are still working through the implications of the legislation and the related guidance for your particular situation as it becomes available and, at this time, have not yet quantified the additional work that may be required. Unless otherwise stated, this additional work is not contemplated in any estimated fee range or fixed fee quote provided within this letter. We will discuss with you any significant additional procedures and fees that may be required prior to commencing on those additional services.

Mona Electric Group, Inc.
January 14, 2019
Page 4

Our fees for these services will be $20,500, and are based on anticipated cooperation from the Company's personnel and the assumption that unexpected circumstances will not be encountered. If significant additional time is necessary, we will discuss a revised fee arrangement with you. We will also invoice for travel and other out-of-pocket costs such as report production, typing, postage, etc.

Our invoices for these fees will be rendered each month as work progresses and are payable on presentation. A 1½ percent per month interest charge will be added to all accounts not paid within thirty (30) days. If there is a significant change in your organizational structure or size due to acquisitions or other events, or a request for additional services has been made, we reserve the right to revise our fees. We shall have the right to halt or terminate entirely our services until payment is received on past due invoices.

**Other Matters**

In connection with providing our professional services described herein, DHG may utilize the services of third party service providers to complete these services. In addition, DHG may use third party providers to provide, at DHG's discretion, administrative, clerical and data analysis services to DHG in connection with our professional services. In the performance of these services for DHG, we may share confidential information with the third party service providers, but remain committed to maintaining the confidentiality and security of your information. Accordingly, we maintain internal policies, procedures, and safeguards to protect the confidentiality of your information. DHG represents to Client that each such third party service provider has agreed to conditions of confidentiality with respect to Client's information to the same or similar extent as DHG has agreed. Furthermore, we are responsible for the adequate oversight of services provided by these third party service providers.

Because of the importance of management's representations, you agree to release and indemnify Dixon Hughes Goodman LLP and its personnel from any liability and costs relating to our services under this letter attributable to any known misrepresentation by management.

In providing our services, we may direct you to provide your information to us through a separate web-based client portal in an effort to provide greater security with respect to the information. In the event we request that you provide your information to us through such a client portal, to the extent you fail to do so or, in using the client portal you fail to monitor and restrict access to only your authorized personnel (any such failure being referred to herein as a "Portal Failure"), we disclaim and you release us from any and all liability for loss and damage, including direct, indirect, consequential, incidental, and special damages such as loss of revenue or anticipated profits, arising from any interception, unintentional disclosure, or communication or unauthorized use of such information incident to a Portal Failure. In addition, you agree not to provide access to the client portal for use by any third party with whom you are affiliated by contract or otherwise without our express prior written consent, and you shall indemnify and hold us harmless from and against any and all claims by any such third party for all damages whatsoever, including direct or indirect damages, consequential, exemplary, incidental, special or punitive damages including lost profits or lost data, arising from such third party's use of materials on, accessed through, or downloaded from the client portal, even if we are aware or have been advised of the use of or the access to the client portal by such third party in contravention of the restrictions set forth herein.

Many of our clients choose to communicate with us by email, and we may use email in connection with this engagement unless you direct us otherwise. We will use reasonable precautions to protect your confidential information, but we have no obligation to employ any measures that you do not regularly employ in protecting your confidential information. As emails can be intercepted and read, disclosed, or otherwise used or communicated by an unintended third party, or may not be delivered to each of the parties to whom they are directed, we cannot guarantee or warrant that email from us will be properly delivered and read only by the addressee. Therefore, we specifically disclaim any liability or responsibility whatsoever for interception or unintentional disclosure or communication of email transmissions, or for the unauthorized use or failed delivery of emails transmitted by us in connection with the performance of this engagement, or the disclosure or communication of confidential or proprietary information arising therefrom (hereinafter collectively referred to as "Email Interruption").

Mona Electric Group, Inc.
January 14, 2019
Page 5

You agree that we shall have no liability for any loss or damage to any person or entity resulting from or related to any Email Interruption, including any consequential, incidental, direct, indirect, or special damages, such as loss of revenues or anticipated profits, and you hereby forever release us from any such liability and shall indemnify us from any claim related thereto.

In the event DHG is required to respond to a subpoena, court order, government regulatory inquiry or other legal process relating to you or your management for the production of documents and/or testimony relative to information we obtained or prepared incident to this or any other engagement, you shall compensate DHG for all time we expend in connection with such response at normal and customary hourly rates, and to reimburse us for all out of pocket expenses incurred in regard to such response.

Whenever possible, each provision of this agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision hereof shall be ineffective or invalid, such ineffectiveness or invalidity shall be only to the extent of such prohibition or invalidity without invalidating the remainder of the provision or the remaining provisions of this agreement, which shall otherwise remain in full force and effect.

The agreements of Mona Electric Group, Inc. and Dixon Hughes Goodman LLP contained in this engagement letter shall survive the completion or termination of this engagement. If the foregoing fairly sets forth your understanding, please sign a copy of this letter in the space indicated and return it to our office. However, if there are other returns you expect us to prepare, please inform us by noting so just below your signature at the end of the returned copy of this letter.

We want to express our appreciation for this opportunity to work with Mona Electric Group, Inc.

Sincerely,

*Dixon Hughes Goodman LLP*

**Dixon Hughes Goodman LLP**

JKB/dlo


Attachments


**Accepted and Agreed:**

**Mona Electric Group, Inc.**

By:  _Vincent P. Mona_____

Date:  January 14, 2019_____

Mona Electric Group, Inc.
January 14, 2019
Page 6

# DHG Additional Tax Compliance-Related Services

- Form 1042, Annual Withholding Tax Return for Foreign Persons
- Information Reporting Including Forms 1099 and Payroll Reporting
- Accounting Method Analysis and Evaluation
- Preparation of Change in Method of Accounting Filing
- 199A
- Form FinCEN Report 114
- Uniform Capitalization Study
- Cost Segregation Study
- Detail Analysis of Expenditures for Classification as Repairs or Capital Assets Under 'Repair' Regulations
- Maintenance of Detailed Depreciation Schedules
- Long-Term Contract Accounting
- Earnings and Profits Studies
- Research and Development Tax Credit Studies
- Sustainability Tax Credits (Historic, Affordable Housing, Energy, etc.)
- Estate and Trust Planning
- Gift Planning
- Business Valuation
- Business Succession Planning
- Mergers, Acquisitions and Restructuring Assistance
- Buy-Side Due Diligence
- Sell-Side Due Diligence
- Transaction Cost Analysis
- Tax Reporting for Acquisitions and Divestitures

- Sales and Use Tax Consulting and Compliance
- Voluntary Disclosure Filings
- State Nexus Review and Analysis
- State Apportionment Review
- State and Local Tax Credit Optimization
- Real and Personal Property Tax Consulting and Compliance
- Reverse Tax Audits and Recovery
- Escheats and Unclaimed Property Filings
- Maintenance of Partnership 704 Books
- Business License Filings
- Protective Claims for Refund
- Maintenance of Shareholder Basis
- Determination of Ownership Changes and Calculation of 382 Limitations
- Preparation of ASC 740 Tax Provision
- Transfer Pricing Documentation and Analysis
- Bookkeeping or Preparation of Separate Legal Entity Trial Balances
- Reconciliation of Intercompany Accounting
- Detailed Analysis of Meals and Entertainment Expenses
- LIFO Calculations for Inventory and Maintenance of Detailed LIFO Schedules
- 754 Elections and Step-Up Calculations
- Entity Classifications and Elections
- Analysis and Recommendations on Withholding Allowances
- 179-D Certification

*Note*: *Some tax services listed above may be prohibited for DHG assurance clients as they may impair SEC and AICPA independence standards.*

**Dixon Hughes Goodman LLP**
**Standard Terms and Conditions**

1.    **Management's Responsibilities.** Management of Client is responsible for designing, implementing, and maintaining internal controls. Dixon Hughes Goodman LLP's ("DHG") services may include advice and recommendations with respect to such systems. Client's management shall be fully and solely responsible for applying independent business judgment with respect to the services and work product provided by DHG, to make implementation decisions, if any, and to determine further courses of action with respect to any matters addressed by DHG to Client in any advice, recommendation, service, report, or other work product or delivery. Client's management agrees to assume all management responsibilities and to oversee the services DHG will provide by designating an individual possessing suitable skill, knowledge, and/or experience. Management of the Client is responsible for evaluating the adequacy and results of the services performed and accepting responsibility for the results of such services.

2.    **Cooperation.** Client agrees to cooperate with DHG in the performance of DHG services to the Client, including the provision to DHG of reasonable facilities and timely access to Client's data, information and personnel. Client shall be responsible for the performance of Client's employees and agents and for the accuracy and completeness of all data and information provided to DHG for purposes of this engagement.

3.    **Term.** Unless terminated sooner in accordance with its terms, this engagement shall terminate upon the completion of DHG's services hereunder. In addition, this engagement may be terminated by either DHG or Client at any time by giving written notice to the other party not less than thirty (30) calendar days before the effective date of termination.

4.    **Payment of Invoices.** Client agrees to pay properly submitted invoices within thirty (30) days of the invoice date (or any other date that DHG may agree to in writing). DHG shall have the right to halt or terminate entirely its services until payment is received on past due invoices. All fees, charges and other amounts payable to DHG hereunder do not include any sales, use, excise, value added or other applicable taxes, tariffs or duties, payment of which shall be Client's sole responsibility, excluding any applicable taxes based on DHG's net income or taxes arising from the employment or independent contractor relationship between DHG and DHG's personnel.

5.    **Ownership.**

      (a)    **DHG Property.** DHG creates, acquires or owns various concepts, methodologies, and techniques; models; templates; software, user interfaces or screen designs; general purpose consulting and software tools; and logic, coherence and methods of operation of systems (collectively, the "DHG Property"). DHG retains all ownership rights in the DHG Property. Client shall acquire no right or interest in such property, except for the license expressly granted in the next paragraph. In addition, DHG shall be free to provide services of any kind to any other party as it deems appropriate, and DHG may use the DHG Property to do so. DHG acknowledges the DHG Property shall not include any of Client's confidential information or Client's tangible or intangible property, and DHG shall have no ownership rights in such property.

      (b)    **Ownership of Deliverables.** Except for DHG Property, and upon full and final payment to DHG, deliverables or work product specified in the engagement letter or proposal to which these terms are attached (the "Deliverables") will become Client's property. If any DHG Property is contained in any of the Deliverables, DHG hereby grants Client, a royalty-free, non-exclusive license to use the DHG Property in connection with the use of the Deliverables.

1

**6.    Infringement.**

(a)    DHG agrees to indemnify, hold harmless and defend Client from and against all claims, liabilities, losses, expenses (including reasonable attorneys' fees), fines, penalties, taxes or damages (collectively "Liabilities") asserted by any third party against Client to the extent such Liabilities result from the infringement by the Deliverables of any third party's trade secrets, trademarks, copyrights, or patents issued as of the date of the attached Proposal or Engagement Letter. The preceding provisions shall not apply to any infringement arising out of the following:

(i)    Use of the Deliverables other than in accordance with applicable documentation or instructions supplied by DHG or other than in accordance with Paragraph 8;

(ii)    Any alteration, modification or revision of the Deliverables not expressly agreed to in writing by DHG; or

(iii)    The combination of the Deliverables with materials not supplied by DHG.

(b)    In case any of the Deliverables or any portion thereof is held, or in DHG's reasonable opinion is likely to be held, in any such suit to constitute infringement, DHG may within a reasonable time, at its option, either:

(i)    Secure for Client the right to continue the use of such infringing item; or

(ii)    Replace, at DHG's sole expense, such item with a substantially equivalent non-infringing item or modify such item so that it becomes non-infringing.

In the event DHG is, in its reasonable discretion, unable to perform either of options described in (i) or (ii) above, Client must return the Deliverable to DHG, and DHG's sole liability shall be to refund to Client the amount Client paid DHG for such item.

(c)    The provisions of this Paragraph 6 state DHG's entire liability and Client's sole and exclusive remedy with respect to any infringement or claim of infringement.

**7.    Limitation on Warranties. THIS IS A SERVICES ENGAGEMENT. DHG WARRANTS THAT IT WILL PERFORM SERVICES HEREUNDER IN GOOD FAITH. DHG DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

**8.    Indemnification.** Client acknowledges and agrees that any advice, recommendations, information or work product provided to Client by DHG in connection with this engagement is based in part upon the accuracy of Client's factual representations to DHG and is not intended to be relied upon by any other parties.  Client will indemnify, defend and hold DHG harmless from and against any and all manner of actions, causes of actions, suits, promises, debts, sums of money, damages, judgments, claims, and any demands whatsoever of any kind, both known and unknown, and of any nature arising under or by virtue of (i) any misrepresentation to DHG by Client, and (ii) claim or demand of any third party to the extent resulting from that party's use or possession of or reliance upon DHG's advice, recommendations, information or work product as a direct or indirect result of Client's use or disclosure of such advice, recommendations, information or work product, except as such use, possession or reliance is specifically authorized by DHG in writing or otherwise authorized by applicable law.

(a)     In connection with this engagement, DHG may direct Client to provide information through a web based client portal in an effort to provide greater security with respect to the information. In the event DHG requests Client to provide information through such a client portal, to the extent Client fails to do so or in using the client portal fails to monitor and restrict access only to Client's authorized personnel (any such failure being referred to herein as a "Portal Failure") DHG disclaims, and Client releases DHG from, any and all liability for loss and damage, including direct, indirect, consequential, incidental, and special damages such as loss of revenue or anticipated profits, arising from any interception, unintentional disclosure or communication or unauthorized use of such information incident to a Portal Failure. In addition, Client agrees not to provide access to the client portal for use by any third-party with whom Client is affiliated by contract or otherwise without the express prior written consent of DHG, and Client shall indemnify and hold DHG harmless from and against any and all claims by any such third-party for all damages whatsoever, including direct or indirect damages, consequential, exemplary, incidental, special or punitive damages including lost profits or lost data, arising from such third party's use of materials on, accessed through, or downloaded from the client portal even if DHG is aware or has been advised of the use of or the access to, the client portal by such third party in contravention of the restrictions set forth herein.

(b)     Many DHG clients choose to communicate with DHG by email, and DHG may use email in connection with this engagement unless Client directs DHG otherwise. DHG will use reasonable precautions to protect confidential Client information, but DHG has no obligation to employ any measures that Client does not regularly employ in protecting confidential information. As emails can be intercepted and read, disclosed, or otherwise used or communicated by an unintended third party, or may not be delivered to each of the parties to whom they are directed, DHG cannot guarantee or warrant that email from DHG will be properly delivered and read only by the addressee. Therefore, DHG specifically disclaims any liability or responsibility whatsoever for interception or unintentional disclosure or communication of email transmissions, or for the unauthorized use or failed delivery of emails transmitted by DHG in connection with the performance of this engagement, or the disclosure or communication of confidential or proprietary information arising therefrom (hereinafter collectively referred to as "Email Interruption"). Client agrees that DHG shall have no liability for any loss or damage to any person or entity resulting from or related to any Email Interruption, including any consequential, incidental, direct, indirect, or special damages, such as loss of revenues or anticipated profits, and Client hereby forever releases DHG from any such liability and shall indemnify DHG from any claim related thereto.

9.    **Remedies/Limitation of Damages.**  Neither Client nor DHG may assert against the other any claim in connection with this engagement unless the asserting party has given the other party written notice of the claim within one (1) year after the asserting party first knew or should have known of the facts giving rise to such claim. DHG shall not be liable to Client for any actions, damages, claims, liabilities, costs, expenses or losses arising out of the services performed hereunder for a total amount in excess of the fees paid or owing to DHG for services rendered by DHG under this engagement. DHG shall not be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including, without limitation, lost profits and opportunity costs). The provisions of this Paragraph shall apply regardless of the form of action, damage, claim, liability, cost, expense, or loss, whether in contract, statute, tort, or otherwise.

10.    **Confidentiality.** DHG acknowledges and agrees that all information received in connection with this engagement shall be received in confidence, shall be used only for purposes of this engagement, and no such confidential information shall be disclosed without prior written consent. Except to the extent otherwise required by applicable law or professional standards, the obligations under this section do not apply to information that: (a) is or becomes generally available to the public other than as a result of disclosure by DHG, (b) was known to DHG or had been previously possessed by DHG without restriction against disclosure at the time of receipt thereof, (c) was independently developed by DHG without violation of this agreement or (d) Client and DHG agree from time to time to disclose. DHG shall be deemed to have met its nondisclosure obligations under this Paragraph as long as it exercises the same level of care to protect the other's information as it exercises to protect its own confidential information, except to the extent that applicable law or professional standards impose a higher requirement.

3

DHG may retain, subject to the terms of this Paragraph, one copy of Client's confidential information required for compliance with applicable professional standards or internal policies.  If DHG receives a request to disclose all or any part of the confidential information pursuant to the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction, DHG agrees to immediately notify the Client of the existence, terms and circumstances surrounding such a request.  In the event DHG is required to respond to a subpoena, court order, government regulatory inquiry or other legal process relating to you or your management for the production of documents and/or testimony relative to information we obtained or prepared incident to this or any other engagement, you shall compensate DHG for all time we expend in connection with such response at normal and customary hourly rates, and to reimburse us for all out of pocket expenses incurred in regard to such response.

11.    **Non-Solicitation.**  Client and DHG each agree, on behalf of their affiliates as well as themselves, that neither will attempt to solicit any employee away from the other for a period commencing with the term of the DHG engagement and ending twelve (12) months after the expiration or termination of the Term of this engagement for any reason (the "Covenant Period").   On behalf of their affiliates as well as themselves, Client and DHG further acknowledge and agree that, in light of the value of each party's employees to that party and the resources invested by each party in their employees, significant damages would be caused one party by the other party's hiring away of its employee(s), and that such damages are difficult to ascertain and uncertain.  Accordingly, Client and DHG further acknowledge and agree that in the event either Client or DHG or any of their respective affiliates breaches this covenant of non-solicitation of employees during the Covenant Period, the breaching party will pay to the other party compensation in an amount equal to two times the current annual base salary of the employee who has been hired in breach of this covenant ("applicable employee"); and the parties further acknowledge and agree that this amount of compensation is a reasonable estimation of the damages that will actually be incurred by a party as a result of the breach of this non-solicitation clause by the other party.  Compensation due pursuant to this provision shall be paid in cash upon employment of the applicable employee.

12.    **Independent Contractor.** Client and DHG are both independent contractors and neither Client nor DHG are, or shall be considered to be, an agent, distributor or representative of the other. Neither Client nor DHG shall act or represent itself, directly or by implication, as an agent of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

13.    **Force Majeure.** Neither Client nor DHG shall be liable for any delays resulting from circumstances or causes beyond their reasonable control, including, without limitation, fire or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

14.    **Assignment.** Neither Client nor DHG may assign, transfer or delegate any of its rights or obligations without the prior written consent of the other party, such consent not to be unreasonably withheld.

15.    **Cannabis Products.**  Client represents and warrants to DHG that Client does not derive substantial or a material amount of its revenue from the manufacture, sale or distribution of cannabis or related products ("Cannabis Products") or from activities which in any material manner support the manufacture, sale or distribution of Cannabis Products.

16.    **Survival.** The provisions of Paragraphs 1, 4, 5, 6, 7, 8, 9, 10, 11, 12 and 14 hereof shall survive the expiration or termination of this engagement.

17.    **Severability.** In the event that any term or provision of this agreement shall be held to be invalid, void or unenforceable, then the remainder of this agreement shall not be affected, and each such term and provision of this agreement shall be valid and enforceable to the fullest extent permitted by law.

18.     **Entire Agreement.** These terms, and the Proposal or Engagement Letter to which these terms are appended, including Exhibits, constitute the entire agreement between Client and DHG with respect to the engagement and supersede all other oral and written representation, understandings or agreements relating to the engagement.

19.     **Governing Law.**   This agreement and any claim arising out of the services provided shall be governed by the laws of the state of North Carolina, exclusive of its conflict of laws rules.

20.     **Venue.**          Any claims or disputes under this agreement shall be heard in a state or federal court sitting in North Carolina having competent jurisdiction over this engagement letter and both parties expressly consent to the personal jurisdiction and venue of such state and federal courts for such actions.



DIXON HUGHES GOODMAN LLP

March 12, 2020

## **Private and Confidential**

Mr. Vincent P. Mona
755 Southern Pines Drive
Naples, FL  34103-2813

Dear Mr. Mona:

Thank you for selecting us to assist you with your tax compliance needs.  We value our relationship with you and appreciate the opportunity to be of service.  This letter, the attached Standard Terms and Conditions Addendum, Appendix A and any other attachments incorporated herein (collectively the "Agreement") confirm our understanding of the terms and objectives of your engagement as well as the nature and limitations of the services we will provide.  In order to ensure an understanding of our mutual responsibilities, we ask all clients for whom returns are prepared to confirm the following arrangements.  If you have any questions or concerns about this letter, please contact us.

### *Engagement Objective and Scope*

We will prepare form 1120S U.S. Income Tax Return for an S Corporation and the state, local and other tax returns listed in Appendix A (attached) for Mona Electric Group, Inc. for the year ended December 31, 2019.

We will not prepare any tax returns except those identified in Appendix A without your written request, and our written consent, to do so.  We will prepare your tax returns based upon information and representations that you provide to us.  We will not audit or otherwise verify the data you submit to us, although we may ask you to clarify or provide additional information where warranted by the rules and standards applicable to us as tax preparers.

This engagement does not include any procedures designed to detect material errors, irregularities or illegal acts, including fraud or theft.  Therefore, this engagement cannot be relied upon to disclose such matters.

This engagement is limited to the professional services outlined above.

### **Your Responsibilities**

You will provide us with a trial balance and other supporting data necessary to prepare your tax returns.  You must provide us with accurate and complete information. Income from all sources, including those outside of the U.S., is required.

We rely upon the accuracy and completeness of the information you provide in rendering professional services to you.

Unless we are specifically advised otherwise by you, we will rely upon information reflected in tax returns which were not prepared by us and on any other information provided by another tax return preparer as being accurate.  You agree to release and forever discharge us from any claim, damage or liability arising from such reliance.



EXHIBIT

D

tabbies

Mona Electric Group, Inc.
March 12, 2020
Page 2 of 12

Additionally, you are responsible for the following:

- Documentation

  Maintaining adequate documentation to substantiate the accuracy and completeness of your tax returns.  You should retain this documentation as it may be necessary to prove the accuracy and completeness of the return to the taxing authority.  Certain transactions, deductions, credits and exclusions are subject to specific substantiation requirements and/or limitations under the Internal Revenue Code and regulations. Examples include: charitable contributions, meals, travel, vehicle use, gifts, entertainment, research and development credits and transactions with related parties. You represent that, unless we are otherwise advised, you have such documentation and can produce it if necessary to respond to any audit or inquiry by tax authorities.

  If you have any questions as to the type of records required, please ask us for advice in that regard.

  We offer additional services such as R&D credit, transfer pricing and other studies to assist you with evaluating and documenting specific return positions.  Unless otherwise stipulated in this agreement, such services are not part of this engagement but may be incorporated upon your written request and our written consent to do so.

- Personal and limited expenses

  Ensuring that personal expenses, if any, are segregated from business expenses and that expenses which are expressly limited, such as meals, entertainment and gifts, are separately identified and disclosed to us.

- S corporation Items

  Reviewing the corporate charter, articles of incorporation, bylaws, applicable state law and other binding agreements (including the partnership or LLC agreement in the case of entities who have made a check the box election for tax purposes) with your attorney to ensure the company has only a singular class of equity ownership which confers identical rights to distribution and liquidation proceeds.

  Determining the appropriate salary or wages to pay shareholders.

  Ensuring distributions are made to shareholders on a pro-rata basis according to their ownership.

  Reviewing buy-sell agreements, incentive compensation plans and any succession planning documents with your attorney to ensure these documents meet your goals and objectives, including those relating to intended tax treatment.

  Verifying all shareholders as being eligible to hold S corporation stock, including ensuring that any elections required to be made by a particular shareholder in order to be classified as an eligible S corporation shareholder have been appropriately filed within the prescribed time period.

  Ensuring that the balance of any shareholder loan, or loan with a related party, reflected on the trial balance is accurate, is properly documented as "bona fide" debt and that principal and interest payments are being made in accordance with the terms of the related promissory note.  Loans to shareholders and related parties which are determined not to meet the "bona fide" standard may be subject to reclassification by the IRS as either distributions or wages.

Mona Electric Group, Inc.
March 12, 2020
Page 3 of 12

Such reclassification could, in some instances, result in a second class of stock terminating the S election. You agree to hold us harmless with respect to any liability resulting from reclassification of amounts reported as shareholder or related party loans. If you ask us to assist with the evaluation of shareholder loan amounts in light of the bona fide debt standard we will confirm this evaluation in a separate engagement letter.

- Schedule K-1

  Distributing a copy of the Schedule K-1s to each shareholder.

  Computation of shareholder basis. Beginning with the 2018 tax year shareholders may be required to report their basis in the S corporation as part of their form 1040 individual income tax return. The computation of basis takes into consideration transactions which occur outside of the corporation and is therefore not part of this engagement. However, we are happy to assist your shareholders with this computation as part of a separate engagement should they request that we do so.

- State and local filing obligations

  Determining your tax filing obligations with any state or local tax authorities, including, but not limited to, income, franchise, sales, use, property or unclaimed property taxes. If upon review of the information you have provided to us as part of this engagement we believe you may have additional material filing obligations for income or franchise tax, we will notify you of this responsibility, however DHG does not specifically research these obligations as part of the engagement unless explicitly contracted. Upon our mutually written agreement we will prepare such additional returns.

- U.S. filing obligations related to foreign financial assets

  Informing us of all your foreign assets and any ownership in foreign entities, so we may properly advise you regarding your filing obligations. As part of your filing obligations, you are required to report the maximum value of specified foreign financial assets, which include financial accounts with foreign institutions and certain other foreign non-account investment assets that exceed certain thresholds. Additionally, special reporting requirements may apply if you own directly or indirectly an interest in a foreign entity. Penalties for failure to meet these reporting requirements are substantial.

- Foreign filing obligations

  Complying with the tax filing requirements of any other country. You acknowledge and agree that we have no responsibility to raise these issues with you and that foreign filing obligations are not within the scope of this engagement. Upon your request, we will introduce you to a firm in our Praxity affiliate network who may assist you with any tax compliance needs you may have in other countries.

- Ultimate responsibility, signature and submission requirements

  Reviewing and examining your returns carefully for accuracy and completeness before filing. Under the Internal Revenue Code, you have final responsibility for your tax returns. We will provide you with a copy of your electronic tax returns and accompanying schedules and statements for review prior to filing with the IRS and state and local tax authorities, as applicable.

  Signing and timely submitting the tax returns prepared under this engagement. **You acknowledge that we are prohibited from transmitting any electronic tax return until we have received the**

Mona Electric Group, Inc.
March 12, 2020
Page 4 of 12

**Form 8879-S, IRS e-file Signature Authorization for Form 1120S, and any similar state and local equivalent authorization form from you.**

Notifying us, at commencement of this engagement, if you wish to paper file rather than having your tax returns filed electronically.

## Our Responsibilities

Unless otherwise noted, we will perform our services in accordance with the Statements on Standards for Tax Services ("SSTSs") issued by the American Institute of Certified Public Accountants ("AICPA") and U.S. Treasury Department Circular 230 ("Circular 230"). It is our duty to perform services with the same standard of care that a reasonable income tax preparer would exercise in this type of engagement.

Bookkeeping assistance
We may propose adjusting and/or tax only journal entries when deemed necessary for purposes of preparing your tax returns. You have the responsibility to understand the nature of any reconciling items between your financial statements and tax return. We are available, upon your request, to provide accounting and bookkeeping services relating to the preparation of your trial balance for purposes of tax return preparation.

Estimated tax payments

You may be required to make quarterly estimated tax payments. Unless otherwise requested by you in writing, we will calculate these payments for the 2020 tax year based upon the information you provide to prepare your 2019 tax returns (the "safe harbor" basis).

Tax advice and return positions

We will be available during the course of the engagement to answer your questions, provide relevant tax information and render advice relating to your tax positions. Our advice is based upon tax reference materials, facts, assumptions, and representations that are subject to change. We will not update our advice after the conclusion of the engagement for subsequent legislative or administrative changes or future judicial interpretations. This engagement does not include the responsibility to amend or correct returns as a result of a retroactive law change.

We will use our judgment to resolve questions in your favor where a tax law is unclear, provided there is sufficient support for doing so. If there are conflicting interpretations of the law, we will explain the possible positions that may be taken on your return. We will follow the position you request, provided it is consistent with our understanding of applicable existing authority. If the IRS, state or local tax authorities later contest the position taken, additional tax, penalties, and interest may be assessed. We assume no liability, and you hereby release us from any liability including but not limited to, additional tax, penalties, interest, and related professional fees.

If you wish to take a tax position based upon the advice of another tax advisor, you agree to obtain a written statement from the advisor confirming that the position should meet the "reasonable basis," "substantial authority," or "more likely than not" standard, as applicable. In preparing your federal tax return, we are subject to diligence requirements as to accuracy and reliance on others under the regulations and Circular 230.

We will, upon your request, prepare disclosure forms for filing with your tax return. The IRS and many states may impose penalties for a substantial understatement of tax where a tax position either does not meet the substantial authority standard or is not disclosed in the form required by the regulations or does not meet the reasonable basis standard (regardless of whether the position is disclosed). You agree to advise us if you wish to disclose a tax treatment on your return.

Mona Electric Group, Inc.
March 12, 2020
Page 5 of 12

The law imposes substantial penalties on taxpayers and tax advisors for failure to disclose listed and other reportable transactions on Form 8886.   In general, reportable transactions are potentially abusive transactions identified by the IRS. Information on reportable transactions including links to the specific transactions identified may be found on the IRS website (https://www.irs.gov/businesses/corporations/abusive-tax-shelters-and-transactions). You acknowledge your responsibility to inform us of any listed transactions or other reportable transactions. You agree to hold our firm harmless with respect to any liability including but not limited to, additional tax, penalties, interest and professional fees resulting from your failure to timely notify us, in writing, of all such transactions in order to facilitate the timely preparation and filing of your tax returns.

We will advise you with regard to tax positions taken in preparation of your tax returns, but you must make all decisions with regard to those matters.  Notwithstanding anything to the contrary, we will not be required to take any position which might subject us to a tax return preparer penalty; we will advise you of the same, and we reserve the right to withdraw from this engagement if you wish to continue to take such tax position. In the event of our withdrawal, you shall continue to be responsible and obligated to pay our fees through the date of withdrawal.

Government Inquiries

We will be available, upon your request, to respond to inquiries by governmental agencies and tax authorities and to represent you in the course of an examination or appeals procedure.  We will render additional invoices for the time and expenses incurred.  If you request that we represent you in an examination or appeals proceeding, we may confirm such representation in a separate engagement letter.

Routine tax consulting assistance

We may provide routine tax consulting assistance from time to time as requested by you.  Such services may include tax research and analysis.  Fees for these services will be billed at the Standard Hourly Rates (SHR) for the personnel performing the services.  A separate engagement letter may be required in the case of significant or non-routine tax consulting projects.

Use of third party service providers

We may utilize the services of third party providers in connection with the provision with our services under this Agreement.  We may share confidential information with these third party providers to be utilized in providing these services.  We are committed to maintaining the confidentiality and security of your information.  Accordingly, we maintain internal policies, procedures and safeguards to protect the confidentiality of your information.  We represent to you that each third party service provider has agreed to conditions of confidentiality with respect to your information to the same or similar extent as DHG has agreed.  Furthermore, we are responsible for the adequate oversight of services provided by these third party service providers.

In some instances we may recommend that you seek counsel from a third party advisor on certain tax positions which are highly complex and/or otherwise warrant certain specialized skills and experience.  You agree to hold our firm harmless with respect to any liability, including but not limited to, additional tax, penalties, interest and professional fees resulting from the taking of such position should you decide not to follow this recommendation.

**Fees**

Unless otherwise agreed in an addendum attached to this agreement (appendix B), our fees for these services will be based upon the time, skill and resources, including use of our proprietary information, required to complete the services plus all out-of-pocket expenses.

Mona Electric Group, Inc.
March 12, 2020
Page 6 of 12

You acknowledge that the complexity of the issues involved, unforeseen circumstances and the amount of assistance requested by you will impact the total fee charged. In addition, this fee depends upon the timely delivery, availability, quality, and completeness of the information you provide to us. You agree that you will deliver all records requested and respond to all inquiries made by our staff to complete this engagement on a timely basis. You agree to pay all fees and expenses incurred whether or not we prepare the tax returns.

A retainer equal to 20% of your prior year's tax return preparation fee is due upon execution of this agreement.

**Timing of engagement**

We expect to begin our services upon receipt of this executed Agreement, your retainer, your December 31, 2019 trial balance, and other supporting data agreed to above.

The original due dates of the returns to be prepared as part of this engagement are listed in Appendix A. In order to ensure there is adequate time for us to complete your returns by the due date, the information needed to complete the tax returns must be received no later than three weeks before the federal return due date or, if applicable, the information receipt date(s) specified in Appendix A.

It may become necessary to apply for an extension of the filing deadline if there are unresolved issues or delays in processing, or if we do not receive all of the necessary information from you on a timely basis. An extension of time to file is not an extension of time for payment of taxes. Penalties and interest may be assessed on any taxes not paid by the original filing due date. To the extent you wish to engage our firm to apply for extensions of time to file tax returns on your behalf, you must notify us of this request at least one week prior to the tax return due date. In some cases, your signature may be needed on such applications prior to filing.

Thank you for engaging us. We want to express our sincere appreciation for this opportunity to work with you.

Please date and execute the enclosed copy of this Agreement and return it to us to acknowledge your acceptance. We will not initiate services until we receive the executed Agreement and retainer.

Sincerely,

*Dixon Hughes Goodman LLP*

Attachments

Accepted and agreed on behalf of the following listed entities.

*Mona Electric Group, Inc.*

I represent that I am the person responsible for the tax matters of the entities listed in Appendix A and have the authority to enter into this agreement on behalf of each of these entities.

By: _____

Date: _____3/15/20_____

Mona Electric Group, Inc.
March 12, 2020
Page 7 of 12

## Appendix A

| Entity Legal Name | Jurisdiction | Form | Original Return Due Date | Agreed Information Submission Date |
|---|---|---|---|---|
| Mona Electric Group, Inc. | Federal | 1120S | 3/15/2020 | * |
| Mona Electric Group, Inc. | District of Columbia | D-20 | 4/15/2020 | * |
| Mona Electric Group, Inc. | Maryland | 510 | 4/15/2020 | * |
| Mona Electric Group, Inc. | Virginia | 502 | 4/15/2020 | * |
| | | | | |
| | | | | |

*Information to prepare returns must be received three weeks ahead of the Federal Return deadline if no dates are listed in the Information Submission Date column.

## Appendix B

| Entity Legal Name | Fee |
|---|---|
| Mona Electric Group, Inc. | $22,500 |

Mona Electric Group, Inc.
March 12, 2020
Page 8 of 12

**Dixon Hughes Goodman LLP**

**Standard Terms and Conditions**

1. **Management's Responsibilities.** Management of Client is responsible for designing, implementing, and maintaining internal controls. Dixon Hughes Goodman LLP's ("DHG") services may include advice and recommendations with respect to such systems. Client's management shall be fully and solely responsible for applying independent business judgment with respect to the services and work product provided by DHG, to make implementation decisions, if any, and to determine further courses of action with respect to any matters addressed by DHG to Client in any advice, recommendation, service, report, or other work product or delivery. Client's management agrees to assume all management responsibilities and to oversee the services DHG will provide by designating an individual possessing suitable skill, knowledge, and/or experience. Management of the Client is responsible for evaluating the adequacy and results of the services performed and accepting responsibility for the results of such services.

2. **Cooperation.** Client agrees to cooperate with DHG in the performance of DHG services to the Client, including the provision to DHG of reasonable facilities and timely access to Client's data, information and personnel. Client shall be responsible for the performance of Client's employees and agents and for the accuracy and completeness of all data and information provided to DHG for purposes of this engagement.

3. **Term.** Unless terminated sooner in accordance with its terms, this engagement shall terminate upon the completion of DHG's services hereunder. In addition, this engagement may be terminated by either DHG or Client at any time by giving written notice to the other party not less than thirty (30) calendar days before the effective date of termination.

4. **Payment of Invoices.** Client agrees to pay properly submitted invoices within thirty (30) days of the invoice date (or any other date that DHG may agree to in writing). DHG shall have the right to halt or terminate entirely its services until payment is received on past due invoices.  All fees, charges and other amounts payable to DHG hereunder do not include any sales, use, excise, value added or other applicable taxes, tariffs or duties, payment of which shall be Client's sole responsibility, excluding any applicable taxes based on DHG's net income or taxes arising from the employment or independent contractor relationship between DHG and DHG's personnel.

5. **Ownership.**

   (a)    **DHG Property.** DHG creates, acquires or owns various concepts, methodologies, and techniques; models; templates; software, user interfaces or screen designs; general purpose consulting and software tools; and logic, coherence and methods of operation of systems (collectively, the "DHG Property"). DHG retains all ownership rights in the DHG Property. Client shall acquire no right or interest in such property, except for the license expressly granted in the next paragraph. In addition, DHG shall be free to provide services of any kind to any other party as it deems appropriate, and DHG may use the DHG Property to do so. DHG acknowledges the DHG Property shall not include any of Client's confidential information or Client's tangible or intangible property, and DHG shall have no ownership rights in such property.

Mona Electric Group, Inc.
March 12, 2020
Page 9 of 12

(b)    **Ownership of Deliverables.** Except for DHG Property, and upon full and final payment to DHG, deliverables or work product specified in the engagement letter or proposal to which these terms are attached (the "Deliverables") will become Client's property. If any DHG Property is contained in any of the Deliverables, DHG hereby grants Client, a royalty-free, non-exclusive license to use the DHG Property in connection with the use of the Deliverables.

6.    <u>Infringement.</u>

(a)    DHG agrees to indemnify, hold harmless and defend Client from and against all claims, liabilities, losses, expenses (including reasonable attorneys' fees), fines, penalties, taxes or damages (collectively "Liabilities") asserted by any third party against Client to the extent such Liabilities result from the infringement by the Deliverables of any third party's trade secrets, trademarks, copyrights, or patents issued as of the date of the attached Proposal or Engagement Letter. The preceding provisions shall not apply to any infringement arising out of the following:

(i)    Use of the Deliverables other than in accordance with applicable documentation or instructions supplied by DHG or other than in accordance with Paragraph 8;

(ii)    Any alteration, modification or revision of the Deliverables not expressly agreed to in writing by DHG; or

(iii)    The combination of the Deliverables with materials not supplied by DHG.

(b)    In case any of the Deliverables or any portion thereof is held, or in DHG's reasonable opinion is likely to be held, in any such suit to constitute infringement, DHG may within a reasonable time, at its option, either:

(i)    Secure for Client the right to continue the use of such infringing item; or

(ii)    Replace, at DHG's sole expense, such item with a substantially equivalent non-infringing item or modify such item so that it becomes non-infringing.

In the event DHG is, in its reasonable discretion, unable to perform either of options described in (i) or (ii) above, Client must return the Deliverable to DHG, and DHG's sole liability shall be to refund to Client the amount Client paid DHG for such item.

(c)    The provisions of this Paragraph 6 state DHG's entire liability and Client's sole and exclusive remedy with respect to any infringement or claim of infringement.

7.    <u>Limitation on Warranties.</u> **THIS IS A SERVICES ENGAGEMENT. DHG WARRANTS THAT IT WILL PERFORM SERVICES HEREUNDER IN GOOD FAITH. DHG DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

Mona Electric Group, Inc.
March 12, 2020
Page 10 of 12

8. **Indemnification.** Client acknowledges and agrees that any advice, recommendations, information or work product provided to Client by DHG in connection with this engagement is based in part upon the accuracy of Client's factual representations to DHG and is not intended to be relied upon by any other parties. Client will indemnify, defend and hold DHG harmless from and against any and all manner of actions, causes of actions, suits, promises, debts, sums of money, damages, judgments, claims, and any demands whatsoever of any kind, both known and unknown, and of any nature arising under or by virtue of (i) any misrepresentation to DHG by Client, and (ii) claim or demand of any third party to the extent resulting from that party's use or possession of or reliance upon DHG's advice, recommendations, information or work product as a direct or indirect result of Client's use or disclosure of such advice, recommendations, information or work product, except as such use, possession or reliance is specifically authorized by DHG in writing or otherwise authorized by applicable law.

   (a)   In connection with this engagement, DHG may direct Client to provide information through a web based client portal in an effort to provide greater security with respect to the information. In the event DHG requests Client to provide information through such a client portal, to the extent Client fails to do so or in using the client portal fails to monitor and restrict access only to Client's authorized personnel (any such failure being referred to herein as a "Portal Failure") DHG disclaims, and Client releases DHG from, any and all liability for loss and damage, including direct, indirect, consequential, incidental, and special damages such as loss of revenue or anticipated profits, arising from any interception, unintentional disclosure or communication or unauthorized use of such information incident to a Portal Failure. In addition, Client agrees not to provide access to the client portal for use by any third-party with whom Client is affiliated by contract or otherwise without the express prior written consent of DHG, and Client shall indemnify and hold DHG harmless from and against any and all claims by any such third-party for all damages whatsoever, including direct or indirect damages, consequential, exemplary, incidental, special or punitive damages including lost profits or lost data, arising from such third party's use of materials on, accessed through, or downloaded from the client portal even if DHG is aware or has been advised of the use of or the access to, the client portal by such third party in contravention of the restrictions set forth herein.

   (b)   Many DHG clients choose to communicate with DHG by email, and DHG may use email in connection with this engagement unless Client directs DHG otherwise. DHG will use reasonable precautions to protect confidential Client information, but DHG has no obligation to employ any measures that Client does not regularly employ in protecting confidential information. As emails can be intercepted and read, disclosed, or otherwise used or communicated by an unintended third party, or may not be delivered to each of the parties to whom they are directed, DHG cannot guarantee or warrant that email from DHG will be properly delivered and read only by the addressee. Therefore, DHG specifically disclaims any liability or responsibility whatsoever for interception or unintentional disclosure or communication of email transmissions, or for the unauthorized use or failed delivery of emails transmitted by DHG in connection with the performance of this engagement, or the disclosure or communication of confidential or proprietary information arising therefrom (hereinafter collectively referred to as "Email Interruption"). Client agrees that DHG shall have no liability for any loss or damage to any person or entity resulting from or related to any Email Interruption, including any consequential, incidental, direct, indirect, or special damages, such as loss of revenues or anticipated profits, and Client hereby forever releases DHG from any such liability and shall indemnify DHG from any claim related thereto.

Mona Electric Group, Inc.
March 12, 2020
Page 11 of 12

9. **Remedies/Limitation of Damages.** Neither Client nor DHG may assert against the other any claim in connection with this engagement unless the asserting party has given the other party written notice of the claim within one (1) year after the asserting party first knew or should have known of the facts giving rise to such claim. DHG shall not be liable to Client for any actions, damages, claims, liabilities, costs, expenses or losses arising out of the services performed hereunder for a total amount in excess of the fees paid or owing to DHG for services rendered by DHG under this engagement. DHG shall not be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including, without limitation, lost profits and opportunity costs). The provisions of this Paragraph shall apply regardless of the form of action, damage, claim, liability, cost, expense, or loss, whether in contract, statute, tort, or otherwise.

10. **Confidentiality.** DHG acknowledges and agrees that all information received in connection with this engagement shall be received in confidence, shall be used only for purposes of this engagement, and no such confidential information shall be disclosed without prior written consent. Except to the extent otherwise required by applicable law or professional standards, the obligations under this section do not apply to information that: (a) is or becomes generally available to the public other than as a result of disclosure by DHG, (b) was known to DHG or had been previously possessed by DHG without restriction against disclosure at the time of receipt thereof, (c) was independently developed by DHG without violation of this agreement or (d) Client and DHG agree from time to time to disclose. DHG shall be deemed to have met its nondisclosure obligations under this Paragraph as long as it exercises the same level of care to protect the other's information as it exercises to protect its own confidential information, except to the extent that applicable law or professional standards impose a higher requirement. DHG may retain, subject to the terms of this Paragraph, one copy of Client's confidential information required for compliance with applicable professional standards or internal policies. If DHG receives a request to disclose all or any part of the confidential information pursuant to the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction, DHG agrees to immediately notify the Client of the existence, terms and circumstances surrounding such a request. In the event DHG is required to respond to a subpoena, court order, government regulatory inquiry or other legal process relating to you or your management for the production of documents and/or testimony relative to information we obtained or prepared incident to this or any other engagement, you shall compensate DHG for all time we expend in connection with such response at normal and customary hourly rates, and to reimburse us for all out of pocket expenses incurred in regard to such response.

11. **Non-Solicitation.** Client and DHG each agree, on behalf of their affiliates as well as themselves, that neither will attempt to solicit any employee away from the other for a period commencing with the term of the DHG engagement and ending twelve (12) months after the expiration or termination of the Term of this engagement for any reason (the "Covenant Period"). On behalf of their affiliates as well as themselves, Client and DHG further acknowledge and agree that, in light of the value of each party's employees to that party and the resources invested by each party in their employees, significant damages would be caused one party by the other party's hiring away of its employee(s), and that such damages are difficult to ascertain and uncertain. Accordingly, Client and DHG further acknowledge and agree that in the event either Client or DHG or any of their respective affiliates breaches this covenant of non-solicitation of employees during the Covenant Period, the breaching party will pay to the other party compensation in an amount equal to two times the current annual base salary of the employee who has been hired in breach of this covenant ("applicable employee"); and the parties further acknowledge and agree that this amount of compensation is a reasonable estimation of the damages that will actually be incurred by a party as a result of the breach of this non-solicitation clause by the other party. Compensation due pursuant to this provision shall be paid in cash upon employment of the applicable employee.

Mona Electric Group, Inc.
March 12, 2020
Page 12 of 12

12. **Independent Contractor.** Client and DHG are both independent contractors and neither Client nor DHG are, or shall be considered to be, an agent, distributor or representative of the other. Neither Client nor DHG shall act or represent itself, directly or by implication, as an agent of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

13. **Force Majeure.** Neither Client nor DHG shall be liable for any delays resulting from circumstances or causes beyond their reasonable control, including, without limitation, fire or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

14. **Assignment.** Neither Client nor DHG may assign, transfer or delegate any of its rights or obligations without the prior written consent of the other party, such consent not to be unreasonably withheld.

15. **Cannabis Products.** Client represents and warrants to DHG that Client does not derive substantial or a material amount of its revenue from the manufacture, sale or distribution of cannabis or related products ("Cannabis Products") or from activities which in any material manner support the manufacture, sale or distribution of Cannabis Products.

16. **Survival.** The provisions of Paragraphs 1, 4, 5, 6, 7, 8, 9, 10, 11, 12 and 14 hereof shall survive the expiration or termination of this engagement.

17. **Severability.** In the event that any term or provision of this agreement shall be held to be invalid, void or unenforceable, then the remainder of this agreement shall not be affected, and each such term and provision of this agreement shall be valid and enforceable to the fullest extent permitted by law.

18. **Entire Agreement.** These terms, and the Proposal or Engagement Letter to which these terms are appended, including Exhibits, constitute the entire agreement between Client and DHG with respect to the engagement and supersede all other oral and written representation, understandings or agreements relating to the engagement.

19. **Governing Law.** This agreement and any claim arising out of the services provided shall be governed by the laws of the state of North Carolina, exclusive of its conflict of laws rules.

20. **Venue.** Any claims or disputes under this agreement shall be heard in a state or federal court sitting in North Carolina having competent jurisdiction over this engagement letter and both parties expressly consent to the personal jurisdiction and venue of such state and federal courts for such actions.