IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Vincent P. Mona** | * |
| Plaintiff, | * |
| | *  Civil No.   **PJM 21-cv-1017** |
| v. | * |
| **David F. McKay,** | * |
| Defendant. | * |

## MEMORANDUM OPINION

Plaintiff Vincent P. Mona ("Mona"), former sole shareholder of Mona Electric Group ("MEG"), has sued David F. McKay ("McKay"), former President of MEG, who represented Mona and MEG, in the sale of MEG to ArchKey Intermediate Holdings, Inc. ("ArchKey"). Mona's essential claim is that McKay breached his duty of loyalty to Mona/MEG by providing inappropriate, harmful information about Mona and MEG to ArchKey throughout the sale process and possibly after.

On June 28, 2023, Mona, through counsel, sent a letter to the Court requesting that it order McKay's counsel to provide Mona with a privilege log of documents and communications relating to the Common Interest Agreement ("the Agreement") McKay executed with ArchKey on November 9, 2021. ECF No. 97. On August 31, 2023, the Court held a Teleconference with counsel to address, among other things, Mona's request. At the end of the Teleconference, the Court ordered defense counsel to produce all documents and communications dated between April 30, 2021 and November 9, 2021, that were exchanged between McKay or McKay's counsel and ArchKey or ArchKey's employees or representatives, including ArchKey's counsel; provided that

1

McKay's counsel was given leave to assert a privilege as to any such documents or communications by furnishing a privilege log to Mona's counsel. *See* ECF No. 117.

On September 11, 2023, McKay produced the log ("the September Log"), asserting attorney-client and/or work product privilege over virtually all the documents the Court ordered McKay's counsel to produce. *See* ECF No. 119. Mona responded in Opposition, ECF No. 120, and McKay replied, ECF No. 122.

For the following reasons, the Court finds that none of the documents and communications in defense counsel's September Log are privileged. Nor are any documents and communications shared between McKay and ArchKey on the privilege log McKay's counsel produced in June ("the June Log"). All the documents must be produced to Mona's counsel within seven calendar days.

## I. BACKGROUND

As indicated, this case involves claims brought by Mona against McKay stemming from McKay's alleged misconduct in handling the sale of Mona's company, MEG, to ArchKey in 2020. *See* Compl. ¶¶ 58–82. From 2009 until the sale, McKay was the President and CEO of MEG. ECF No. 102-1 at 7. In 2019, Mona, as founder, sole shareholder, and Chairman of the Board of MEG, "directed McKay to lead, manage, and execute a strategy to sell MEG," Compl. ¶ 8; *see also* ECF No. 102-1 at 6–7. McKay and Mona agreed that upon closing, Mona would provide McKay a bonus, calculated as a percentage of the sales price, to be paid directly by ArchKey to McKay. *Id.* at 21. On February 1, 2020, Mona sold his MEG shares to ArchKey for $21 million. *Id.* at 21–22. McKay received $714,727 from ArchKey as his "Transaction Bonus". *Id.* at 21. The final sales price, however, was subject to what is known as a true-up; that is, after nine months, after the purchaser would be in a better position to evaluate the true value of the sale assets, the purchase

2

price would increase or decrease accordingly.[1] After a nine-month adjustment period, ArchKey, as Purchaser, took the position that the true value of MEG was $8.375 million. *Id.* at 6, 22.

After the sale of MEG, Mona resigned from MEG's Board of Directors. *Id.* at 22. McKay remained an employee of MEG, now in the possession of ArchKey, retaining the title of CEO but not that of President. *Id.* About a year later, on March 5, 2021, McKay retired from MEG. Then on March 23, 2021, Mona sued McKay, alleging that during the sales process, "McKay deceptively manipulated offer communications from prospective buyers, failed to accurately convey opportunities to [Mona], and exploited his position of trust . . . for personal financial gain." Compl. ¶ 12. Mona further alleged "that McKay colluded with ArchKey in breach of his duties to Mona before, during, and after the sale of [MEG] to ArchKey." ECF No. 120 at 2.

About one month later, on April 30, 2021, ArchKey sued Mona in the Delaware Court of Chancery for his alleged failure to reimburse a portion of the purchase price based on what ArchKey believed was the correct true-up value of MEG. *See* ECF No. 18. Mona counterclaimed in that litigation on June 18, 2021. *See* ECF No. 119 at 2. McKay then filed a Motion to Stay the action in this Court pending resolution of the Delaware action, which this Court denied on October 15, 2021. ECF No. 36.[2] On November 9, 2021, unbeknownst to Mona or his counsel, counsel for McKay and ArchKey executed a "Common Interest Agreement" to "discuss the[ir] defense of Mona's claims and counterclaims in the [present litigation and the Delaware litigation], without

---

[1] Section 2.6 of the Stock Purchase Agreement details how the Purchaser would calculate the value of the company at the end of the Adjustment Period, including (1) that the Purchaser would liquidate any investments and the net proceeds would be reflected as an asset on the Adjusted Closing Balance Sheet, (2) prepaid expenses would be shown only as the amount actually realized during the Adjustment Period, and (3) any accounts receivable that were collected by the end of the Adjustment Period would be written off and assigned to the Company or Seller. *See* ECF No. 113-48 at 4.

[2] The Delaware litigation apparently remains unresolved as of this time.

3

waiving or releasing any privileges." ECF No. 118, Ex. 85 at 1. The Agreement states that it is intended to be retroactively effective to May 6, 2021. *Id.*

Mona only learned of the existence of the Agreement on October 26, 2022 when his counsel deposed ArchKey's corporate representative, Patrick Kriegshauser, in the Delaware litigation. ECF No. 119 at 2; ECF No. 91 at 4. At a Teleconference with this Court on April 11, 2023, Mona argued that McKay should have disclosed the Agreement in response to Mona's written discovery requests as well as to direct questions posed to McKay at McKay's deposition in the present action that preceded the Kriegshauser deposition, but that — deceptively — McKay had not done so. *See* ECF No. 108 at 18; *see also* ECF No. 91 at 4. Eventually, however, pursuant to the Court's order at the Teleconference, defense counsel produced a copy of the Agreement to Mona's counsel on June 2, 2023. Defense counsel also provided a privilege log of, among other things, documents and communications relating to the Agreement dated through April 30, 2021.[3] *See* ECF No. 97. Still, McKay's counsel refused to produce documents dated after April 30, 2021, on the basis of his belief that they were outside the "relevant period" as defined by Mona's discovery requests. ECF No. 98. Mona therefore moved to compel McKay to provide a privilege log of documents and communications relating to McKay's Agreement with ArchKey from April 30, 2021, through November 9, 2021, the date the Agreement was executed. *See* ECF No. 97. After hearing argument on the issue at the Teleconference, the Court ordered McKay to produce such documents and communications, allowing, however, that McKay's counsel could attempt to assert a privilege as to any of the documents by providing a privilege log to Mona's counsel. ECF No. 117. McKay thereafter produced a privilege log, after asserting privilege over all entries. *See* ECF No. 119.

---

[3] Defense counsel apparently has produced some but not all documents dated prior to April 30, 2021. As to other documents prior to that date, defense counsel asserts privilege. But, as will be described *infra*, these other documents, insofar as they represent exchanges with ArchKey, must now also be produced.

4

McKay argues that the documents the Court ordered McKay to produce are protected by the common interest privilege as well as the work product and/or attorney client privileges. He submits that as of April 30, 2021, both McKay and ArchKey were in active litigation against Mona and therefore had a common legal interest in discussing common defense strategies. For his part, Mona believes that no common interest existed between McKay and ArchKey, certainly not prior to the date they executed the Agreement on November 9, 2021 if not after; therefore, says McKay, defense counsel must produce everything on the September Log because McKay waived any privilege that may have applied. Mona further argues that McKay's counsel must produce all the documents and communications referred to in the June Log. *See* ECF No. 120 at 7 n.1.

## II. APPLICABLE LAW

The common interest rule or doctrine protects communications between parties who share a common interest in litigation. *In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 341 (4th Cir. 2005). The privilege allows "persons with a common interest to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims." *Id.* (internal quotations omitted). The doctrine "presupposes the existence of an otherwise valid privilege" and "applies not only to communications subject to the attorney-client privilege, but also to communications protected by the work-product doctrine." *In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129*, 902 F.2d 244, 249 (4th Cir. 1990).

In the Fourth Circuit, the proponent of the privilege has the burden to establish that the privilege applies and that there is in fact a common interest. *See Sheet Metal Workers Int'l Ass'n v. Sweeney*, 29 F.3d 120, 125 (4th Cir. 1994); *see also Hanwha Azdel, Inc. v. C & D Zodiac, Inc.*, 617 F. App'x 227, 243 (4th Cir. 2015). A "written agreement is not required, and it is not necessary that both parties to the communications at issue be co-parties in litigation" but "there

5

must be an agreement or a meeting of the minds." *In Hempel v. Cydan Dev., Inc.*, 2020 U.S. Dist. LEXIS 153208, at *22 (D. Md. Aug. 24, 2020); *see also Am. Mgmt. Servs., LLC v. Dep't of the Army*, 703 F.3d 724, 733 (4th Cir. 2013) (finding that "there must be an agreement or a meeting of the minds" for the common interest doctrine to apply and that mere "indicia of joint strategy as of a particular point in time are insufficient to demonstrate that a common interest agreement has been formed") (internal citations and quotations omitted).

Further, case law from this district indicates that where, as here, the proponent of the privilege does not claim that there is common ownership or complete control, he must demonstrate that the communicating parties shared "an identical legal interest" with respect to the subject matter of the communication. *See Glynn v. EDO Corp.*, 2010 WL 3294347, at *7 (D. Md. Aug. 20, 2010); *Elat v. Ngoubene*, 2013 WL 4478190, at *2 (D. Md. Aug. 16, 2013); *Beyond Sys., Inc. v. Kraft Foods, Inc.*, 2010 WL 3059344, at *3 (D. Md. Aug. 4, 2010); *Neuberger Berman Real Estate Income Fund*, 230 F.R.D. 398, 415–16 (D. Md. 2005).

### III. ANALYSIS

Mona seeks documents and communications dated prior to November 9, 2021, and the Court concludes that he is entitled to them. McKay has failed to establish that there was a cognizable common interest agreement in existence between McKay and ArchKey prior to the written Agreement executed on November 9, 2021 (if not after), or that he and ArchKey shared an identical legal interest, or that the common interest doctrine protects the documents and communications at issue. Further, McKay has not quieted the Court's concern that an agreement of the sort he defends could be relied on by McKay as a license to breach any duty of loyalty he may have owed to Mona while negotiating the sale of MEG, or indeed after that, given that ArchKey continues to dispute the true value of MEG in the Delaware action and that McKay,

Mona's representative in the sale of MEG, apparently seeks to align himself with ArchKey and against Mona. The short of the matter is that the Court finds no privilege of any sort protects the documents and communications McKay's counsel seeks to withhold in the present litigation.

## A. The Existence of a Common Interest Prior to November 9, 2021

McKay asserts that the common interest privilege attached on April 30, 2021 when ArchKey sued Mona, not on November 9, 2021 when McKay and ArchKey executed the Agreement. While McKay is correct that an agreement need not be reduced to writing for the common interest doctrine to apply, McKay must still show that, notwithstanding the lack of a written agreement, there was in fact "an agreement or a meeting of the minds" between ArchKey and McKay prior to November 9, 2021. *See Am. Mgmt. Servs.*, 703 F.3d at 733. But the only evidence McKay has provided of an earlier agreement is that (1) in April 2021, ArchKey filed suit against Mona; (2) in May 2021, McKay disclosed in his initial report to the Court that, because "McKay is now retired . . . it is clear that the bulk of any [Electronically Stored Information] resides with [MEG], Arch[K]ey, and their accountants and attorneys"; and (3) on September 11, 2023, McKay's counsel labeled correspondence sent in July 2021 as subject to the "Joint Defense Privilege" in the September Log. ECF No. 119 at 9; ECF No. 119-1 at Doc. ID 1163; ECF No. 122 at 6. None of these facts suffices to establish the existence of an agreement or a meeting of the minds prior to November 9, 2021, as required for the common interest doctrine to apply.[4] At most, the first two items show only unilateral action taken by either McKay or ArchKey, not an

---

[4] The fact that the Agreement itself states that it is retroactively effective as of May 6, 2021 does not establish that there was in fact a meeting of the minds as of May 6, 2021. Indeed, it strongly points to a concern on the part of McKay and ArchKey that they very likely believed they did not have agreement before November 9, 2021 and sought to cover that concern by including the retroactivity clause.

agreement between them. The third reference to any agreement took place after the Agreement was executed and therefore does not establish that an agreement was in fact in existence earlier.

Nor has McKay established that he and ArchKey shared an "identical" legal interest with respect to the subject matter of the documents and communications at issue. *See Beyond Sys., Inc. v. Kraft Foods, Inc.*, No. PJM-08-409, 2010 WL 3059344, at *3 (D. Md. Aug. 4, 2010); *see also Neuberger Berman Real Estate v. Lola Brown Tr., No. 1B*, 230 F.R.D. 398, 416 (D. Md. 2005) (noting that "unless there is common ownership or control, courts engage in a painstaking analysis to determine whether the third party shares an identical, not merely similar, legal interest") (internal citations and quotations omitted). While McKay asserts that the common legal interest here is that Mona and ArchKey are both defending against a common opponent in two active lawsuits, McKay fails to acknowledge that Mona has brought distinct legal claims in each. In Delaware, Mona asserts that ArchKey must pay him the original agreed-upon price for MEG as opposed to the much lower so-called true-up value ArchKey now contends for, while in the present litigation, Mona alleges that McKay intentionally mishandled the sale of MEG, including colluding with ArchKey to Mona's detriment. While these claims are related, it is by no means accurate to say that ArchKey and McKay share an "identical" legal interest with respect to them.

Indeed, McKay's and ArchKey's interests are clearly at odds in at least one key respect. In Delaware, ArchKey presumably wants the Court to value MEG at as low a price as possible so that Mona would owe ArchKey money back from the purchase price. But McKay "was a 4.18% beneficiary of the sale," ECF No. 20 at 1, so that if MEG is valued at lower than $21 million, McKay will have to pay back (presumably as a credit to Mona) a portion of the $714,727 Transaction Bonus he received from ArchKey. In that sense, McKay's interest does not align with ArchKey's.

8

The same reasoning applies to defense counsel's June Log, ECF No. 120-1, which includes documents dated from February 13, 2020 to April 30, 2021. The Court does not need additional briefing on the issue. None of the communications or documents on the June Log exchanged between McKay or McKay's counsel to ArchKey, or ArchKey's employees or representatives, including ArchKey's counsel, and none of the communications or documents on the September Log would be protected by the common interest doctrine. Nor, for reasons to be described presently, can McKay relay on the attorney-client or work product privileges.

## B. Double Duties of Loyalty and Confidentiality

The Court finds that McKay's Common Interest Agreement with ArchKey or indeed any other understanding McKay may have had with ArchKey do not supersede the double duties of loyalty and confidentiality that McKay owed to Mona as both a former employee of MEG and as Mona's designated broker for the sale of MEG. McKay argues that the Agreement does not conflict with any duty of loyalty or confidentiality because Mona was never McKay's employer, only MEG was. *See* ECF No. 119 at 3–4. That argument fails for at least two reasons.

First, McKay owed both MEG and Mona a duty of loyalty and confidentiality even as a former employee of MEG. "[E]very contract of employment contains an 'implied duty that an employee act solely for the benefit of his employer in all matters within the scope of employment, avoiding all conflicts between his duty to the employer and his own self-interest.'" *EndoSurg Med., Inc. v. EndoMaster Med., Inc.*, 71 F. Supp. 3d 525, 556 (D. Md. 2014) (citing *Md. Metals, Inc. v. Metzner*, 382 A.2d 564, 568 (Md. 1978)). This duty continues to restrict an employee's conduct after the termination of his or her employment. *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38 (2d

9

Cir. 1999).[5] A former employee, for example, may not "misuse . . . his former employer's trade secrets and confidential information." *See Md. Metals*, 382 A.2d at 568; *EndoSurg Med., Inc.*, 71 F. Supp. 3d at 556. It is of no matter that McKay was technically employed by MEG and not Mona personally. Mona was the founder and sole shareholder of MEG. The corporation itself was inanimate. To the extent necessary, the corporate veil will be pierced. And the Court wonders — what conversations did McKay have with ArchKey about ArchKey's future relationship with (or promises to) McKay while McKay was still in the employ of MEG and actively negotiating the sale of MEG to ArchKey? What possibly confidential information may McKay have told ArchKey about Mona and MEG after he began working with ArchKey?[6] And even today, what may McKay be prepared to testify to about Mona and MEG in the Delaware litigation? Might he be prepared to tell ArchKey that MEG's assets have been over-valued?

But McKay was not only a former employee of MEG; he was Mona's de facto broker for the sale of MEG. As the de facto broker of a business sale, he owed additional duties of loyalty and confidentiality to Mona which would apply independently of whether McKay was an active or former employee of MEG. *Moehling v. W. E. O'Neil Const. Co.*, 170 N.E.2d 100, 267 (Ill. 1960) ("The relation existing between principal and agent for the sale or purchase of property is a fiduciary one . . . whereby the agent sustains a position of trust toward his principal and in all his transactions affecting the subject of his agency the law dictates he must act in utmost good faith . . ."); *Frey v. Fraser Yachts*, 29 F.3d 1153, 1156 (7th Cir. 1994); *Supreme Showroom, Inc. v. Branded Apparel Grp.*, 2018 WL 3148357, at *10 (S.D.N.Y. June 27, 2018). An article by Donna

---

[5] *See also Ensuring Fair Competition When a Former Employee Has No Restrictive Covenants: Common Law Protections for Employers*, THOMSON REUTERS (2023), https://corporate.findlaw.com/business-operations/ensuring-fair-competition-when-a-former-employee-has-no.html.

[6] Arguably, the Common Interest Agreement itself points to the possibility that McKay has shared or is still sharing confidential information about Mona/MEG with ArchKey as opposed to preserving it.

10

S. Dailey, President and Founder of the School of Business Brokerage, an online training program for individuals participating in the business brokerage industry, is instructive:

> When a business broker becomes an agent of a seller or buyer, either intentionally by entering into a listing agreement or unintentionally by actions, the relationship is termed fiduciary. Fiduciary duties are the highest duties known to law. A fiduciary is expected to be extremely loyal to the person to whom they owe the duty, the principal, client, seller or the buyer. These fiduciary duties are in addition to any duties or responsibilities included in the listing "employment agreement" or the buyer representation agreement.
>
> **Fiduciary duties of the business broker include:**
>
> **Loyalty** – is the most basic fiduciary duty. A business broker must be loyal and keep his client's best interests above all others including his own. The business broker must not allow the amount of commission to be earned on each offer prevent him from presenting all offers to his client. To do so, would be a violation of the fiduciary duty of loyalty.
>
> **Confidentiality** – a business broker is obligated to keep his client's confidence and secrets. A business broker should not reveal any confidential information that would lessen his client's negotiating position. A business broker would be violating confidentiality by telling a buyer that his seller client was desperate to sell due to a divorce. This is of course if his seller client had not given him permission to reveal this information.
>
> **Disclosure** – a business broker must disclose to his client all relevant and material information. A business broker should share with his client everything he knows about the transaction, his knowledge of third parties, etc.
>
> **Obedience** – a business broker is obligated to obey all lawful instructions of his client.
>
> **Reasonable care and diligence** – a business broker is obligated to represent his client competently. A business broker promotes his services as a professional with knowledge and skill in business transfers. Therefore, the law requires the business broker to act with and provide his client with competent guidance and advice. The fiduciary duty of reasonable care and diligence is often the duty violated by inexperienced and untrained business brokers.

Donna S. Dailey, *Fiduciary – Big Word with Big Responsibility*, SCHOOL OF BUSINESS BROKERAGE (Apr. 5, 2014); *see also* Carol C. Honigberg, *Courts Examine Brokers' Fiduciary Duties*,

COMMERCIAL REAL ESTATE'S GLOBAL STANDARD FOR PROFESSIONAL ACHIEVEMENT;[7] *c.f. Roman v. Lobe*, 243 N.Y. 51, 54 ("The real estate broker is brought by his calling into a relation of trust and confidence. Constant are the opportunities by concealment and collusion to extract illicit gains.") (Cardozo, J.); *c.f.* Standard of Practice 1-9, Code of Ethics and Standards of Practice of the National Association of Realtors (stating that the obligation of realtors "to preserve confidential information . . . provided by their clients in the course of any agency relationship or non-agency relationship recognized by law *continues after termination of agency relationships or any non-agency relationships recognized by law*") (emphasis added).

Mona selected McKay to broker the sale of MEG to ArchKey, entrusting him to perform the task with utmost integrity and to obtain the best deal possible for Mona and MEG. *See Md. Metals*, 382 A.2d at 568 (noting that "[b]ecause corporate managerial personnel enjoy a high degree of trust and confidence in performing their assigned functions, a potential exists for serious abuse of confidentiality"). As a former employee of MEG, and as the de facto broker for Mona in the sale of MEG, McKay owed Mona double duties of loyalty and confidentiality to act solely for the benefit of Mona and MEG in the sale. Following the sale, this duty continued in effect so as to preclude McKay from misusing any confidential information he may have obtained while working with Mona at MEG or while acting as the broker for the sale of MEG.

It is particularly relevant that, as this is written, ArchKey is challenging the terms of the sale of MEG, claiming that Mona owes ArchKey money back on the sales price. It is quite possible that McKay may have shared information with ArchKey that he only came into possession of because he was once MEG's employee and Mona's confidante in the sale of MEG. Yet, McKay contends that the Common Interest Agreement somehow would allow him to share information

---

[7] Available at https://www.schoolofbusinessbrokerage.com/fiduciary-big-word-big-responsibility/ and https://www.ccim.com/cire-magazine/articles/courts-examine-brokers-fiduciary-duties/ respectively.

"regarding the sale of MEG, [and] documents surrounding that sale" with ArchKey and presumably to aid ArchKey in its pursuit of claims against Mona, all while blocking Mona from in any way monitoring what confidences McKay may have shared or may share hereafter with ArchKey. ECF No. 119 at 9. Simple fairness, as well as legal strictures, dictate that McKay cannot be permitted to exploit Mona's trust in such fashion. *See Md. Metals*, 382 A.2d at 568. He may not use the Agreement to circumvent the double duties of loyalty and confidentiality he owed to Mona. The Court finds that no privilege exists with respect to McKay and his counsel's communications with ArchKey.[8]

## IV. CONCLUSION

The Court concludes that no documents or communications exchanged between McKay or his counsel and ArchKey dated prior to November 9, 2021 are privileged. McKay must therefore produce to Mona's counsel all documents and communications on defense counsel's September Log, and all documents and communications on defense counsel's June Log that were (1) sent by McKay or McKay's counsel to ArchKey, or ArhchKey's employees or representatives, including ArchKey's counsel, or (2) sent to McKay or McKay's counsel from ArchKey, or ArchKey's employees or representatives, including ArchKey's counsel. McKay and his counsel must make this production within seven (7) calendar days.

A separate Order will **ISSUE**.

October 1͞2͞, 2023

/s/
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

---

[8] Given that Mona intends to seek reasonable attorney's fees as damages at trial, the Court will defer any question of the fees and costs Mona seeks in connection with this discovery dispute to the trial.